TROXEL ET VIR *v.* GRANVILLE

No. 99–138.   Argued January 12, 2000—Decided June 5, 2000

58

O'CONNOR, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., and GINSBURG and BREYER, JJ., joined. SOUTER, J., *post*, p. 75, and THOMAS, J., *post*, p. 80, filed opinions concurring in the judgment. STEVENS, J., *post*, p. 80, SCALIA, J., *post*, p. 91, and KENNEDY, J., *post*, p. 93, filed dissenting opinions.

*Mark D. Olson* argued the cause for petitioners. With him on the briefs was *Eric Schnapper.*

*Catherine W. Smith* argued the cause for respondent. With her on the brief was *Howard M. Goodfriend.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Washington et al. by *Christine O. Gregoire*, Attorney General of Washington, and *Maureen A. Hart*, Senior Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Mark Pryor* of Arkansas, *Bill Lockyer* of California, *Ken Salazar* of Colorado, *Earl I. Anzai* of Hawaii, *Carla J. Stovall* of Kansas, *Jeremiah W. (Jay) Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *John J. Farmer, Jr.,* of New Jersey, *Heidi Heitkamp* of North Dakota, *Betty D. Montgomery* of Ohio, and *Paul G. Summers* of Tennessee; for AARP et al. by *Rochelle Bobroff, Bruce Vignery,* and *Michael Schuster*; for Grandparents United for Children's Rights, Inc., by *Judith Sperling Newton* and *Carol M. Gapen;* for the National Conference of State Legislatures et al. by *Richard Ruda* and *James I. Crowley;* and for the Grandparent Caregiver Law Center of the Brookdale Center on Aging.

Briefs of *amici curiae* urging affirmance were filed for the American Academy of Matrimonial Lawyers by *Barbara Ellen Handschu* and *Sanford K. Ain;* for the American Center for Law and Justice by *Jay Alan Sekulow, Colby May, Vincent McCarthy,* and *John P. Tuskey;* for the American Civil Liberties Union et al. by *Matthew A. Coles, Michael P. Adams, Catherine Weiss,* and *Steven R. Shapiro;* for the Coalition for the Restoration of Parental Rights by *Karen A. Wyle;* for the Institute for Justice et al. by *William H. Mellor, Clint Bolick,* and *Scott G. Bullock;* for the Center for the Original Intent of the Constitution by *Michael P. Farris;* for the Christian Legal Society et al. by *Kimberlee Wood Colby, Gregory S. Baylor,* and *Carl H. Esbeck;* for the Lambda Legal Defense

JUSTICE O'CONNOR announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE GINSBURG, and JUSTICE BREYER join.

Section 26.10.160(3) of the Revised Code of Washington permits "[a]ny person" to petition a superior court for visitation rights "at any time," and authorizes that court to grant such visitation rights whenever "visitation may serve the best interest of the child." Petitioners Jenifer and Gary Troxel petitioned a Washington Superior Court for the right to visit their grandchildren, Isabelle and Natalie Troxel. Respondent Tommie Granville, the mother of Isabelle and Natalie, opposed the petition. The case ultimately reached the Washington Supreme Court, which held that § 26.10.160(3) unconstitutionally interferes with the fundamental right of parents to rear their children.

I

Tommie Granville and Brad Troxel shared a relationship that ended in June 1991. The two never married, but they had two daughters, Isabelle and Natalie. Jenifer and Gary Troxel are Brad's parents, and thus the paternal grandparents of Isabelle and Natalie. After Tommie and Brad separated in 1991, Brad lived with his parents and regularly brought his daughters to his parents' home for weekend visitation. Brad committed suicide in May 1993. Although the Troxels at first continued to see Isabelle and Natalie on a regular basis after their son's death, Tommie Granville in-

and Education Fund et al. by *Patricia M. Logue, Ruth E. Harlow,* and *Beatrice Dohrn;* for the Society of Catholic Social Scientists by *Stephen M. Krason* and *Richard W. Garnett;* and for Debra Hein by *Stuart M. Wilder.*

Briefs of *amici curiae* were filed for the Center for Children's Policy Practice & Research at the University of Pennsylvania by *Barbara Bennett Woodhouse;* for the Domestic Violence Project, Inc./Safe House (Michigan) et al. by *Anne L. Argiroff* and *Ann L. Routt;* for the National Association of Counsel for Children by *Robert C. Fellmeth* and *Joan Hollinger;* and for the Northwest Women's Law Center et al. by *Cathy J. Zavis.*

formed the Troxels in October 1993 that she wished to limit their visitation with her daughters to one short visit per month. *In re Smith,* 137 Wash. 2d 1, 6, 969 P. 2d 21, 23–24 (1998); *In re Troxel,* 87 Wash. App. 131, 133, 940 P. 2d 698, 698–699 (1997).

In December 1993, the Troxels commenced the present action by filing, in the Washington Superior Court for Skagit County, a petition to obtain visitation rights with Isabelle and Natalie. The Troxels filed their petition under two Washington statutes, Wash. Rev. Code §§ 26.09.240 and 26.10.160(3) (1994). Only the latter statute is at issue in this case. Section 26.10.160(3) provides: "Any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances." At trial, the Troxels requested two weekends of overnight visitation per month and two weeks of visitation each summer. Granville did not oppose visitation altogether, but instead asked the court to order one day of visitation per month with no overnight stay. 87 Wash. App., at 133–134, 940 P. 2d, at 699. In 1995, the Superior Court issued an oral ruling and entered a visitation decree ordering visitation one weekend per month, one week during the summer, and four hours on both of the petitioning grandparents' birthdays. 137 Wash. 2d, at 6, 969 P. 2d, at 23; App. to Pet. for Cert. 76a–78a.

Granville appealed, during which time she married Kelly Wynn. Before addressing the merits of Granville's appeal, the Washington Court of Appeals remanded the case to the Superior Court for entry of written findings of fact and conclusions of law. 137 Wash. 2d, at 6, 969 P. 2d, at 23. On remand, the Superior Court found that visitation was in Isabelle's and Natalie's best interests:

"The Petitioners [the Troxels] are part of a large, central, loving family, all located in this area, and the Peti-

tioners can provide opportunities for the children in the areas of cousins and music.

". . . The court took into consideration all factors regarding the best interest of the children and considered all the testimony before it. The children would be benefitted from spending quality time with the Petitioners, provided that that time is balanced with time with the childrens' *[sic]* nuclear family. The court finds that the childrens' *[sic]* best interests are served by spending time with their mother and stepfather's other six children." App. 70a.

Approximately nine months after the Superior Court entered its order on remand, Granville's husband formally adopted Isabelle and Natalie. *Id.*, at 60a–67a.

The Washington Court of Appeals reversed the lower court's visitation order and dismissed the Troxels' petition for visitation, holding that nonparents lack standing to seek visitation under § 26.10.160(3) unless a custody action is pending. In the Court of Appeals' view, that limitation on nonparental visitation actions was "consistent with the constitutional restrictions on state interference with parents' fundamental liberty interest in the care, custody, and management of their children." 87 Wash. App., at 135, 940 P. 2d, at 700 (internal quotation marks omitted). Having resolved the case on the statutory ground, however, the Court of Appeals did not expressly pass on Granville's constitutional challenge to the visitation statute. *Id.*, at 138, 940 P. 2d, at 701.

The Washington Supreme Court granted the Troxels' petition for review and, after consolidating their case with two other visitation cases, affirmed. The court disagreed with the Court of Appeals' decision on the statutory issue and found that the plain language of § 26.10.160(3) gave the Troxels standing to seek visitation, irrespective of whether a custody action was pending. 137 Wash. 2d, at 12, 969 P.

2d, at 26–27. The Washington Supreme Court nevertheless agreed with the Court of Appeals' ultimate conclusion that the Troxels could not obtain visitation of Isabelle and Natalie pursuant to § 26.10.160(3). The court rested its decision on the Federal Constitution, holding that § 26.10.160(3) unconstitutionally infringes on the fundamental right of parents to rear their children. In the court's view, there were at least two problems with the nonparental visitation statute. First, according to the Washington Supreme Court, the Constitution permits a State to interfere with the right of parents to rear their children only to prevent harm or potential harm to a child. Section 26.10.160(3) fails that standard because it requires no threshold showing of harm. *Id.*, at 15–20, 969 P. 2d, at 28–30. Second, by allowing "'any person' to petition for forced visitation of a child at 'any time' with the only requirement being that the visitation serve the best interest of the child," the Washington visitation statute sweeps too broadly. *Id.*, at 20, 969 P. 2d, at 30. "It is not within the province of the state to make significant decisions concerning the custody of children merely because it could make a 'better' decision." *Ibid.*, 969 P. 2d, at 31. The Washington Supreme Court held that "[p]arents have a right to limit visitation of their children with third persons," and that between parents and judges, "the parents should be the ones to choose whether to expose their children to certain people or ideas." *Id.*, at 21, 969 P. 2d, at 31. Four justices dissented from the Washington Supreme Court's holding on the constitutionality of the statute. *Id.*, at 23–43, 969 P. 2d, at 32–42.

We granted certiorari, 527 U. S. 1069 (1999), and now affirm the judgment.

## II

The demographic changes of the past century make it difficult to speak of an average American family. The composition of families varies greatly from household to household. While many children may have two married parents and

grandparents who visit regularly, many other children are raised in single-parent households. In 1996, children living with only one parent accounted for 28 percent of all children under age 18 in the United States. U. S. Dept. of Commerce, Bureau of Census, Current Population Reports, 1997 Population Profile of the United States 27 (1998). Understandably, in these single-parent households, persons outside the nuclear family are called upon with increasing frequency to assist in the everyday tasks of child rearing. In many cases, grandparents play an important role. For example, in 1998, approximately 4 million children—or 5.6 percent of all children under age 18—lived in the household of their grandparents. U. S. Dept. of Commerce, Bureau of Census, Current Population Reports, Marital Status and Living Arrangements: March 1998 (Update), p. *i* (1998).

The nationwide enactment of nonparental visitation statutes is assuredly due, in some part, to the States' recognition of these changing realities of the American family. Because grandparents and other relatives undertake duties of a parental nature in many households, States have sought to ensure the welfare of the children therein by protecting the relationships those children form with such third parties. The States' nonparental visitation statutes are further supported by a recognition, which varies from State to State, that children should have the opportunity to benefit from relationships with statutorily specified persons—for example, their grandparents. The extension of statutory rights in this area to persons other than a child's parents, however, comes with an obvious cost. For example, the State's recognition of an independent third-party interest in a child can place a substantial burden on the traditional parent-child relationship. Contrary to JUSTICE STEVENS' accusation, our description of state nonparental visitation statutes in these terms, of course, is not meant to suggest that "children are so much chattel." *Post*, at 89 (dissenting opinion). Rather, our terminology is intended to highlight the fact that these

statutes can present questions of constitutional import. In this case, we are presented with just such a question. Specifically, we are asked to decide whether § 26.10.160(3), as applied to Tommie Granville and her family, violates the Federal Constitution.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." We have long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, "guarantees more than fair process." *Washington* v. *Glucksberg*, 521 U. S. 702, 719 (1997). The Clause also includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.*, at 720; see also *Reno* v. *Flores*, 507 U. S. 292, 301–302 (1993).

The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in *Meyer* v. *Nebraska*, 262 U. S. 390, 399, 401 (1923), we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." Two years later, in *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534–535 (1925), we again held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." We explained in *Pierce* that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.*, at 535. We returned to the subject in *Prince* v. *Massachusetts*, 321 U. S. 158 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary

function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.*, at 166.

In subsequent cases also, we have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children. See, *e. g., Stanley* v. *Illinois,* 405 U. S. 645, 651 (1972) ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements'" (citation omitted)); *Wisconsin* v. *Yoder,* 406 U. S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); *Quilloin* v. *Walcott,* 434 U. S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected"); *Parham* v. *J. R.,* 442 U. S. 584, 602 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course"); *Santosky* v. *Kramer,* 455 U. S. 745, 753 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Glucksberg, supra,* at 720 ("In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the righ[t] . . . to direct the education and upbringing of one's children" (citing *Meyer* and *Pierce*)). In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

Section 26.10.160(3), as applied to Granville and her family in this case, unconstitutionally infringes on that fundamental parental right. The Washington nonparental visitation statute is breathtakingly broad. According to the statute's text, *"[a]ny person* may petition the court for visitation rights *at any time,"* and the court may grant such visitation rights whenever "visitation may serve *the best interest of the child."* § 26.10.160(3) (emphases added). That language effectively permits any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review. Once the visitation petition has been filed in court and the matter is placed before a judge, a parent's decision that visitation would not be in the child's best interest is accorded no deference. Section 26.10.160(3) contains no requirement that a court accord the parent's decision any presumption of validity or any weight whatsoever. Instead, the Washington statute places the best-interest determination solely in the hands of the judge. Should the judge disagree with the parent's estimation of the child's best interests, the judge's view necessarily prevails. Thus, in practical effect, in the State of Washington a court can disregard and overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the judge's determination of the child's best interests. The Washington Supreme Court had the opportunity to give § 26.10.160(3) a narrower reading, but it declined to do so. See, *e. g.,* 137 Wash. 2d, at 5, 969 P. 2d, at 23 ("[The statute] allow[s] any person, at any time, to petition for visitation without regard to relationship to the child, without regard to changed circumstances, and without regard to harm"); *id.,* at 20, 969 P. 2d, at 30 ("[The statute] allow[s] 'any person' to petition for forced visitation of a child at 'any time' with the only requirement being that the visitation serve the best interest of the child").

Turning to the facts of this case, the record reveals that the Superior Court's order was based on precisely the type of mere disagreement we have just described and nothing more. The Superior Court's order was not founded on any special factors that might justify the State's interference with Granville's fundamental right to make decisions concerning the rearing of her two daughters. To be sure, this case involves a visitation petition filed by grandparents soon after the death of their son—the father of Isabelle and Natalie—but the combination of several factors here compels our conclusion that § 26.10.160(3), as applied, exceeded the bounds of the Due Process Clause.

First, the Troxels did not allege, and no court has found, that Granville was an unfit parent. That aspect of the case is important, for there is a presumption that fit parents act in the best interests of their children. As this Court explained in *Parham:*

> "[O]ur constitutional system long ago rejected any notion that a child is the mere creature of the State and, on the contrary, asserted that parents generally have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations. . . . The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children." 442 U. S., at 602 (alteration in original) (internal quotation marks and citations omitted).

Accordingly, so long as a parent adequately cares for his or her children (*i. e.,* is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the

best decisions concerning the rearing of that parent's children.   See, *e. g., Flores,* 507 U. S., at 304.

The problem here is not that the Washington Superior Court intervened, but that when it did so, it gave no special weight at all to Granville's determination of her daughters' best interests.   More importantly, it appears that the Superior Court applied exactly the opposite presumption.   In reciting its oral ruling after the conclusion of closing arguments, the Superior Court judge explained:

> "The burden is to show that it is in the best interest of the children to have some visitation and some quality time with their grandparents.   I think in most situations a commonsensical approach [is that] it is normally in the best interest of the children to spend quality time with the grandparent, unless the grandparent, *[sic]* there are some issues or problems involved wherein the grandparents, their lifestyles are going to impact adversely upon the children.   That certainly isn't the case here from what I can tell."   Verbatim Report of Proceedings in *In re Troxel,* No. 93–3–00650–7 (Wash. Super. Ct., Dec. 14, 19, 1994), p. 213 (hereinafter Verbatim Report).

The judge's comments suggest that he presumed the grandparents' request should be granted unless the children would be "impact[ed] adversely."   In effect, the judge placed on Granville, the fit custodial parent, the burden of *disproving* that visitation would be in the best interest of her daughters. The judge reiterated moments later: "I think [visitation with the Troxels] would be in the best interest of the children and I haven't been shown it is not in [the] best interest of the children."   *Id.,* at 214.

The decisional framework employed by the Superior Court directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child.   See *Parham, supra,* at 602.   In that respect, the court's pre-

sumption failed to provide any protection for Granville's fundamental constitutional right to make decisions concerning the rearing of her own daughters. Cf., *e. g.*, Cal. Fam. Code Ann. § 3104(e) (West 1994) (rebuttable presumption that grandparent visitation is not in child's best interest if parents agree that visitation rights should not be granted); Me. Rev. Stat. Ann., Tit. 19A, § 1803(3) (1998) (court may award grandparent visitation if in best interest of child and "would not significantly interfere with any parent-child relationship or with the parent's rightful authority over the child"); Minn. Stat. § 257.022(2)(a)(2) (1998) (court may award grandparent visitation if in best interest of child and "such visitation would not interfere with the parent-child relationship"); Neb. Rev. Stat. § 43–1802(2) (1998) (court must find "by clear and convincing evidence" that grandparent visitation "will not adversely interfere with the parent-child relationship"); R. I. Gen. Laws § 15–5–24.3(a)(2)(v) (Supp. 1999) (grandparent must rebut, by clear and convincing evidence, presumption that parent's decision to refuse grandparent visitation was reasonable); Utah Code Ann. § 30–5–2(2)(e) (1998) (same); *Hoff* v. *Berg*, 595 N. W. 2d 285, 291–292 (N. D. 1999) (holding North Dakota grandparent visitation statute unconstitutional because State has no "compelling interest in presuming visitation rights of grandparents to an unmarried minor are in the child's best interests and forcing parents to accede to court-ordered grandparental visitation unless the parents are first able to prove such visitation is not in the best interests of their minor child"). In an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren. Needless to say, however, our world is far from perfect, and in it the decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance. And, if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination.

Finally, we note that there is no allegation that Granville ever sought to cut off visitation entirely. Rather, the present dispute originated when Granville informed the Troxels that she would prefer to restrict their visitation with Isabelle and Natalie to one short visit per month and special holidays. See 87 Wash. App., at 133, 940 P. 2d, at 699; Verbatim Report 12. In the Superior Court proceedings Granville did not oppose visitation but instead asked that the duration of any visitation order be shorter than that requested by the Troxels. While the Troxels requested two weekends per month and two full weeks in the summer, Granville asked the Superior Court to order only one day of visitation per month (with no overnight stay) and participation in the Granville family's holiday celebrations. See 87 Wash. App., at 133, 940 P. 2d, at 699; Verbatim Report 9 ("Right off the bat we'd like to say that our position is that grandparent visitation is in the best interest of the children. It is a matter of how much and how it is going to be structured") (opening statement by Granville's attorney). The Superior Court gave no weight to Granville's having assented to visitation even before the filing of any visitation petition or subsequent court intervention. The court instead rejected Granville's proposal and settled on a middle ground, ordering one weekend of visitation per month, one week in the summer, and time on both of the petitioning grandparents' birthdays. See 87 Wash. App., at 133–134, 940 P. 2d, at 699; Verbatim Report 216–221. Significantly, many other States expressly provide by statute that courts may not award visitation unless a parent has denied (or unreasonably denied) visitation to the concerned third party. See, e. g., Miss. Code Ann. § 93–16–3(2)(a) (1994) (court must find that "the parent or custodian of the child unreasonably denied the grandparent visitation rights with the child"); Ore. Rev. Stat. § 109.121(1)(a)(B) (1997) (court may award visitation if the "custodian of the child has denied the grandparent reasonable opportunity to visit the child"); R. I. Gen. Laws §§ 15–5–

24.3(a)(2)(iii)–(iv) (Supp. 1999) (court must find that parents prevented grandparent from visiting grandchild and that "there is no other way the petitioner is able to visit his or her grandchild without court intervention").

Considered together with the Superior Court's reasons for awarding visitation to the Troxels, the combination of these factors demonstrates that the visitation order in this case was an unconstitutional infringement on Granville's fundamental right to make decisions concerning the care, custody, and control of her two daughters. The Washington Superior Court failed to accord the determination of Granville, a fit custodial parent, any material weight. In fact, the Superior Court made only two formal findings in support of its visitation order. First, the Troxels "are part of a large, central, loving family, all located in this area, and the [Troxels] can provide opportunities for the children in the areas of cousins and music." App. 70a. Second, "[t]he children would be benefitted from spending quality time with the [Troxels], provided that that time is balanced with time with the childrens' [sic] nuclear family." Ibid. These slender findings, in combination with the court's announced presumption in favor of grandparent visitation and its failure to accord significant weight to Granville's already having offered meaningful visitation to the Troxels, show that this case involves nothing more than a simple disagreement between the Washington Superior Court and Granville concerning her children's best interests. The Superior Court's announced reason for ordering one week of visitation in the summer demonstrates our conclusion well: "I look back on some personal experiences . . . . We always spen[t] as kids a week with one set of grandparents and another set of grandparents, [and] it happened to work out in our family that [it] turned out to be an enjoyable experience. Maybe that can, in this family, if that is how it works out." Verbatim Report 220–221. As we have explained, the Due Process Clause does not permit a State to infringe on the fundamental right

of parents to make child rearing decisions simply because a state judge believes a "better" decision could be made.   Neither the Washington nonparental visitation statute generally—which places no limits on either the persons who may petition for visitation or the circumstances in which such a petition may be granted—nor the Superior Court in this specific case required anything more.   Accordingly, we hold that § 26.10.160(3), as applied in this case, is unconstitutional.

Because we rest our decision on the sweeping breadth of § 26.10.160(3) and the application of that broad, unlimited power in this case, we do not consider the primary constitutional question passed on by the Washington Supreme Court—whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation.   We do not, and need not, define today the precise scope of the parental due process right in the visitation context.   In this respect, we agree with JUSTICE KENNEDY that the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best "elaborated with care."   *Post*, at 101 (dissenting opinion).   Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter.*   See, *e. g., Fair-*

---

*All 50 States have statutes that provide for grandparent visitation in some form.   See Ala. Code § 30–3–4.1 (1989); Alaska Stat. Ann. § 25.20.065 (1998); Ariz. Rev. Stat. Ann. § 25–409 (1994); Ark. Code Ann. § 9–13–103 (1998); Cal. Fam. Code Ann. § 3104 (West 1994); Colo. Rev. Stat. § 19–1–117 (1999); Conn. Gen. Stat. § 46b–59 (1995); Del. Code Ann., Tit. 10, § 1031(7) (1999); Fla. Stat. § 752.01 (1997); Ga. Code Ann. § 19–7–3 (1991); Haw. Rev. Stat. § 571–46.3 (1999); Idaho Code § 32–719 (1999); Ill. Comp. Stat., ch. 750, § 5/607 (1998); Ind. Code § 31–17–5–1 (1999); Iowa Code § 598.35 (1999); Kan. Stat. Ann. § 38–129 (1993); Ky. Rev. Stat. Ann. § 405.021 (Baldwin 1990); La. Rev. Stat. Ann. § 9:344 (West Supp. 2000); La. Civ. Code Ann., Art. 136 (West Supp. 2000); Me. Rev. Stat. Ann., Tit. 19A, § 1803 (1998);

*banks* v. *McCarter*, 330 Md. 39, 49–50, 622 A. 2d 121, 126–127 (1993) (interpreting best-interest standard in grandparent visitation statute normally to require court's consideration of certain factors); *Williams* v. *Williams*, 256 Va. 19, 501 S. E. 2d 417, 418 (1998) (interpreting Virginia nonparental visitation statute to require finding of harm as condition precedent to awarding visitation).

JUSTICE STEVENS criticizes our reliance on what he characterizes as merely "a guess" about the Washington courts' interpretation of § 26.10.160(3). *Post*, at 82 (dissenting opinion). JUSTICE KENNEDY likewise states that "[m]ore specific guidance should await a case in which a State's highest court has considered all of the facts in the course of elaborating the protection afforded to parents by the laws of the State and by the Constitution itself." *Post*, at 102 (dissenting opinion). We respectfully disagree. There is no need to hypothesize about how the Washington courts *might* apply § 26.10.160(3) because the Washington Superior Court *did* apply the statute in this very case. Like the Washington Supreme Court, then, we are presented with an actual visitation order and the reasons why the Superior Court believed

Md. Fam. Law Code Ann. § 9–102 (1999); Mass. Gen. Laws § 119:39D (1996); Mich. Comp. Laws Ann. § 722.27b (West Supp. 1999); Minn. Stat. § 257.022 (1998); Miss. Code Ann. § 93–16–3 (1994); Mo. Rev. Stat. § 452.402 (Supp. 1999); Mont. Code Ann. § 40–9–102 (1997); Neb. Rev. Stat. § 43–1802 (1998); Nev. Rev. Stat. § 125C.050 (Supp. 1999); N. H. Rev. Stat. Ann. § 458:17–d (1992); N. J. Stat. Ann. § 9:2–7.1 (West Supp. 1999–2000); N. M. Stat. Ann. § 40–9–2 (1999); N. Y. Dom. Rel. Law § 72 (McKinney 1999); N. C. Gen. Stat. §§ 50–13.2, 50–13.2A (1999); N. D. Cent. Code § 14–09–05.1 (1997); Ohio Rev. Code Ann. §§ 3109.051, 3109.11 (Supp. 1999); Okla. Stat., Tit. 10, § 5 (Supp. 1999); Ore. Rev. Stat. § 109.121 (1997); 23 Pa. Cons. Stat. §§ 5311–5313 (1991); R. I. Gen. Laws §§ 15–5–24 to 15–5–24.3 (Supp. 1999); S. C. Code Ann. § 20–7–420(33) (Supp. 1999); S. D. Codified Laws § 25–4–52 (1999); Tenn. Code Ann. §§ 36–6–306, 36–6–307 (Supp. 1999); Tex. Fam. Code Ann. § 153.433 (Supp. 2000); Utah Code Ann. § 30–5–2 (1998); Vt. Stat. Ann., Tit. 15, §§ 1011–1013 (1989); Va. Code Ann. § 20–124.2 (1995); W. Va. Code §§ 48–2B–1 to 48–2B–7 (1999); Wis. Stat. §§ 767.245, 880.155 (1993–1994); Wyo. Stat. Ann. § 20–7–101 (1999).

entry of the order was appropriate in this case. Faced with the Superior Court's application of §26.10.160(3) to Granville and her family, the Washington Supreme Court chose not to give the statute a narrower construction. Rather, that court gave §26.10.160(3) a literal and expansive interpretation. As we have explained, that broad construction plainly encompassed the Superior Court's application of the statute. See *supra*, at 67.

There is thus no reason to remand the case for further proceedings in the Washington Supreme Court. As JUSTICE KENNEDY recognizes, the burden of litigating a domestic relations proceeding can itself be "so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated." *Post*, at 101. In this case, the litigation costs incurred by Granville on her trip through the Washington court system and to this Court are without a doubt already substantial. As we have explained, it is apparent that the entry of the visitation order in this case violated the Constitution. We should say so now, without forcing the parties into additional litigation that would further burden Granville's parental right. We therefore hold that the application of §26.10.160(3) to Granville and her family violated her due process right to make decisions concerning the care, custody, and control of her daughters.

Accordingly, the judgment of the Washington Supreme Court is affirmed.

*It is so ordered.*

JUSTICE SOUTER, concurring in the judgment.

I concur in the judgment affirming the decision of the Supreme Court of Washington, whose facial invalidation of its own state statute is consistent with this Court's prior cases addressing the substantive interests at stake. I would say no more. The issues that might well be presented by reviewing a decision addressing the specific application of the

state statute by the trial court, *ante*, at 68–73, are not before us and do not call for turning any fresh furrows in the "treacherous field" of substantive due process. *Moore* v. *East Cleveland*, 431 U. S. 494, 502 (1977) (opinion of Powell, J.).

The Supreme Court of Washington invalidated its state statute based on the text of the statute alone, not its application to any particular case.[1] Its ruling rested on two independently sufficient grounds: the failure of the statute to require harm to the child to justify a disputed visitation order, *In re Smith*, 137 Wash. 2d 1, 17, 969 P. 2d 21, 29 (1998), and the statute's authorization of "any person" at "any time" to petition for and to receive visitation rights subject only to a free-ranging best-interests-of-the-child standard, *id.*, at 20–21, 969 P. 2d, at 30–31. *Ante*, at 63. I see no error in the second reason, that because the state statute authorizes any person at any time to request (and a judge to award) visitation rights, subject only to the State's particular best-

---

[1] The Supreme Court of Washington made its ruling in an action where three separate cases, including the Troxels', had been consolidated. *In re Smith*, 137 Wash. 2d 1, 6–7, 969 P. 2d 21, 23–24 (1998). The court also addressed two statutes, Wash. Rev. Code § 26.10.160(3) (Supp. 1996) and former Wash. Rev. Code § 26.09.240 (1994), 137 Wash. 2d, at 7, 969 P. 2d, at 24, the latter of which is not even at issue in this case. See Brief for Petitioners 6, n. 9; see also *ante*, at 61. Its constitutional analysis discussed only the statutory language and neither mentioned the facts of any of the three cases nor reviewed the records of their trial court proceedings below. 137 Wash. 2d, at 13–21, 969 P. 2d, at 27–31. The decision invalidated both statutes without addressing their application to particular facts: "We conclude petitioners have standing but, *as written*, the statutes violate the parents' constitutionally protected interests. These statutes allow any person, at any time, to petition for visitation without regard to relationship to the child, without regard to changed circumstances, and without regard to harm." *Id.*, at 5, 969 P. 2d, at 23 (emphasis added); see also *id.*, at 21, 969 P. 2d, at 31 ("RCW 26.10.160(3) and former RCW 26.09.240 impermissibly interfere with a parent's fundamental interest in the care, custody and companionship of the child" (citations and internal quotation marks omitted)).

interests standard, the state statute sweeps too broadly and is unconstitutional on its face. Consequently, there is no need to decide whether harm is required or to consider the precise scope of the parent's right or its necessary protections.

We have long recognized that a parent's interests in the nurture, upbringing, companionship, care, and custody of children are generally protected by the Due Process Clause of the Fourteenth Amendment. See, *e. g., Meyer* v. *Nebraska,* 262 U. S. 390, 399, 401 (1923); *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535 (1925); *Stanley* v. *Illinois,* 405 U. S. 645, 651 (1972); *Wisconsin* v. *Yoder,* 406 U. S. 205, 232 (1972); *Quilloin* v. *Walcott,* 434 U. S. 246, 255 (1978); *Parham* v. *J. R.,* 442 U. S. 584, 602 (1979); *Santosky* v. *Kramer,* 455 U. S. 745, 753 (1982); *Washington* v. *Glucksberg,* 521 U. S. 702, 720 (1997). As we first acknowledged in *Meyer,* the right of parents to "bring up children," 262 U. S., at 399, and "to control the education of their own" is protected by the Constitution, *id.,* at 401. See also *Glucksberg, supra,* at 761 (SOUTER, J., concurring in judgment).

On the basis of this settled principle, the Supreme Court of Washington invalidated its statute because it authorized a contested visitation order at the intrusive behest of any person at any time subject only to a best-interests-of-the-child standard. In construing the statute, the state court explained that the "any person" at "any time" language was to be read literally, 137 Wash. 2d, at 10–11, 969 P. 2d, at 25–27, and that "[m]ost notably the statut[e] do[es] not require the petitioner to establish that he or she has a substantial relationship with the child," *id.,* at 20–21, 969 P. 2d, at 31. Although the statute speaks of granting visitation rights whenever "visitation may serve the best interest of the child," Wash. Rev. Code § 26.10.160(3) (1994), the state court authoritatively read this provision as placing hardly any limit on a court's discretion to award visitation rights. As the court understood it, the specific best-interests provision in the

statute would allow a court to award visitation whenever it thought it could make a better decision than a child's parent had done. See 137 Wash. 2d, at 20, 969 P. 2d, at 31 ("It is not within the province of the state to make significant decisions concerning the custody of children merely because it could make a 'better' decision").[2] On that basis in part, the Supreme Court of Washington invalidated the State's own statute: "Parents have a right to limit visitation of their children with third persons." *Id.*, at 21, 969 P. 2d, at 31.

Our cases, it is true, have not set out exact metes and bounds to the protected interest of a parent in the relationship with his child, but *Meyer*'s repeatedly recognized right of upbringing would be a sham if it failed to encompass the right to be free of judicially compelled visitation by "any party" at "any time" a judge believed he "could make a 'better' decision"[3] than the objecting parent had done. The strength of a parent's interest in controlling a child's associates is as obvious as the influence of personal associations on the development of the child's social and moral character. Whether for good or for ill, adults not only influence but may indoctrinate children, and a choice about a child's social companions is not essentially different from the designation of the adults who will influence the child in school. Even a State's considered judgment about the preferable political and religious character of schoolteachers is not entitled

---

[2] As JUSTICE O'CONNOR points out, the best-interests provision "contains no requirement that a court accord the parent's decision any presumption of validity or any weight whatsoever. Instead, the Washington statute places the best-interest determination solely in the hands of the judge." *Ante*, at 67.

[3] Cf. *Chicago* v. *Morales*, 527 U. S. 41, 71 (1999) (BREYER, J., concurring in part and concurring in judgment) ("The ordinance is unconstitutional, not because a policeman applied this discretion wisely or poorly in a particular case, but rather because the policeman enjoys too much discretion in *every* case. And if every application of the ordinance represents an exercise of unlimited discretion, then the ordinance is invalid in all its applications").

to prevail over a parent's choice of private school. *Pierce, supra,* at 535 ("The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations").   It would be anomalous, then, to subject a parent to any individual judge's choice of a child's associates from out of the general population merely because the judge might think himself more enlightened than the child's parent.[4]   To say the least (and as the Court implied in *Pierce*), parental choice in such matters is not merely a default rule in the absence of either governmental choice or the government's designation of an official with the power to choose for whatever reason and in whatever circumstances.

Since I do not question the power of a State's highest court to construe its domestic statute and to apply a demanding standard when ruling on its facial constitutionality,[5] see *Chicago* v. *Morales,* 527 U. S. 41, 55, n. 22 (1999) (opinion of STEVENS, J.), this for me is the end of the case.   I would simply affirm the decision of the Supreme Court of Washington that its statute, authorizing courts to grant visitation rights to any person at any time, is unconstitutional.   I therefore respectfully concur in the judgment.

---

[4] The Supreme Court of Washington invalidated the broadly sweeping statute at issue on similarly limited reasoning: "Some parents and judges will not care if their child is physically disciplined by a third person; some parents and judges will not care if a third person teaches the child a religion inconsistent with the parents' religion; and some judges and parents will not care if the child is exposed to or taught racist or sexist beliefs. But many parents and judges will care, and, between the two, the parents should be the ones to choose whether to expose their children to certain people or ideas."   137 Wash. 2d, at 21, 969 P. 2d, at 31 (citation omitted).

[5] This is the pivot between JUSTICE KENNEDY's approach and mine.

JUSTICE THOMAS, concurring in the judgment.

I write separately to note that neither party has argued that our substantive due process cases were wrongly decided and that the original understanding of the Due Process Clause precludes judicial enforcement of unenumerated rights under that constitutional provision. As a result, I express no view on the merits of this matter, and I understand the plurality as well to leave the resolution of that issue for another day.*

Consequently, I agree with the plurality that this Court's recognition of a fundamental right of parents to direct the upbringing of their children resolves this case. Our decision in *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925), holds that parents have a fundamental constitutional right to rear their children, including the right to determine who shall educate and socialize them. The opinions of the plurality, JUSTICE KENNEDY, and JUSTICE SOUTER recognize such a right, but curiously none of them articulates the appropriate standard of review. I would apply strict scrutiny to infringements of fundamental rights. Here, the State of Washington lacks even a legitimate governmental interest—to say nothing of a compelling one—in second-guessing a fit parent's decision regarding visitation with third parties. On this basis, I would affirm the judgment below.

JUSTICE STEVENS, dissenting.

The Court today wisely declines to endorse either the holding or the reasoning of the Supreme Court of Washington. In my opinion, the Court would have been even wiser to deny certiorari. Given the problematic character of the trial court's decision and the uniqueness of the Washington statute, there was no pressing need to review a State Su-

---

*This case also does not involve a challenge based upon the Privileges and Immunities Clause and thus does not present an opportunity to reevaluate the meaning of that Clause. See *Saenz* v. *Roe*, 526 U. S. 489, 527–528 (1999) (THOMAS, J., dissenting).

preme Court decision that merely requires the state legislature to draft a better statute.

Having decided to address the merits, however, the Court should begin by recognizing that the State Supreme Court rendered a federal constitutional judgment holding a state law invalid on its face. In light of that judgment, I believe that we should confront the federal questions presented directly. For the Washington statute is not made facially invalid either because it may be invoked by too many hypothetical plaintiffs, or because it leaves open the possibility that someone may be permitted to sustain a relationship with a child without having to prove that serious harm to the child would otherwise result.

## I

In response to Tommie Granville's federal constitutional challenge, the State Supreme Court broadly held that Wash. Rev. Code § 26.10.160(3) (Supp. 1996) was invalid on its face under the Federal Constitution.[1] Despite the nature of this judgment, JUSTICE O'CONNOR would hold that the Washington visitation statute violated the Due Process Clause of the Fourteenth Amendment only as applied. *Ante,* at 65, 67, 73 (plurality opinion). I agree with JUSTICE SOUTER, *ante,* at 75–76, and n. 1 (opinion concurring in judgment), that this approach is untenable.

The task of reviewing a trial court's application of a state statute to the particular facts of a case is one that should be performed in the first instance by the state appellate courts. In this case, because of their views of the Federal Constitution, the Washington state appeals courts have yet to decide whether the trial court's findings were adequate under the

---

[1] The State Supreme Court held that, "as written, the statutes violate the parents' constitutionally protected interests." *In re Smith,* 137 Wash. 2d 1, 5, 969 P. 2d 21, 23 (1998).

statute.[2] Any as-applied critique of the trial court's judgment that this Court might offer could only be based upon a guess about the state courts' application of that State's statute, and an independent assessment of the facts in this case—both judgments that we are ill-suited and ill-advised to make.[3]

---

[2] As the dissenting judge on the state appeals court noted, "[t]he trial court here was not presented with any guidance as to the proper test to be applied in a case such as this." *In re Troxel*, 87 Wash. App. 131, 143, 940 P. 2d 698, 703 (1997) (opinion of Ellington, J.). While disagreeing with the appeals court majority's conclusion that the state statute was constitutionally infirm, Judge Ellington recognized that despite this disagreement, the appropriate result would not be simply to affirm. Rather, because there had been no definitive guidance as to the proper construction of the statute, "[t]he findings necessary to order visitation over the objections of a parent are thus not in the record, and I would remand for further proceedings." *Ibid.*

[3] Unlike JUSTICE O'CONNOR, *ante*, at 69–70, I find no suggestion in the trial court's decision in this case that the court was applying any presumptions at all in its analysis, much less one in favor of the grandparents. The first excerpt JUSTICE O'CONNOR quotes from the trial court's ruling, *ante*, at 69, says nothing one way or another about *who* bears the burden under the statute of demonstrating "best interests." There is certainly no indication of a presumption *against* the parents' judgment, only a "'commonsensical'" estimation that, usually but not always, visiting with grandparents can be good for children. *Ibid.* The second quotation, "'I think [visitation] would be in the best interest of the children and I haven't been shown it is not in [the] best interest of the children,'" *ibid.*, sounds as though the judge has simply concluded, based on the evidence before him, that visitation in this case would be in the best interests of both girls. Verbatim Report of Proceedings in *In re Troxel*, No. 93–3–00650–7 (Wash. Super. Ct., Dec. 14, 1994), p. 214. These statements do not provide us with a definitive assessment of the law the court applied regarding a "presumption" either way. Indeed, a different impression is conveyed by the judge's very next comment: "That has to be balanced, of course, with Mr. and Mrs. Wynn [a.k.a. Tommie Granville], who are trying to put together a family that includes eight children, . . . trying to get all those children together at the same time and put together some sort of functional unit wherein the children can be raised as brothers and sisters and spend lots of quality time together." *Ibid.* The judge then went on to reject the Troxels' efforts to attain the same level of visitation that

While I thus agree with JUSTICE SOUTER in this respect, I do not agree with his conclusion that the State Supreme Court made a definitive construction of the visitation statute that necessitates the constitutional conclusion he would draw.[4] As I read the State Supreme Court's opinion, *In re Smith*, 137 Wash. 2d 1, 19–20, 969 P. 2d 21, 30–31 (1998), its interpretation of the Federal Constitution made it unnecessary to adopt a definitive construction of the statutory text, or, critically, to decide whether the statute had been correctly applied in this case. In particular, the state court gave no content to the phrase, "best interest of the child," Wash. Rev. Code § 26.10.160(3) (Supp. 1996)—content that might well be gleaned from that State's own statutes or decisional law employing the same phrase in different contexts,

---

their son, the girls' biological father, would have had, had he been alive. "[T]he fact that Mr. Troxel is deceased and he was the natural parent and as much as the grandparents would maybe like to step into the shoes of Brad, under our law that is not what we can do. The grandparents cannot step into the shoes of a deceased parent, per say *[sic]*, as far as whole gamut of visitation rights are concerned." *Id.*, at 215. Rather, as the judge put it, "I understand your desire to do that as loving grandparents. Unfortunately that would impact too dramatically on the children and their ability to be integrated into the nuclear unit with the mother." *Id.*, at 222–223.

However one understands the trial court's decision—and my point is merely to demonstrate that it is surely open to interpretation—its validity under the state statute as written is a judgment for the state appellate courts to make in the first instance.

[4] JUSTICE SOUTER would conclude from the state court's statement that the statute "do[es] not require the petitioner to establish that he or she has a substantial relationship with the child," 137 Wash. 2d, at 21, 969 P. 2d, at 31, that the state court has "authoritatively read [the 'best interests'] provision as placing hardly any limit on a court's discretion to award visitation rights," *ante*, at 77 (opinion concurring in judgment). Apart from the question whether one can deem this description of the statute an "authoritative" construction, it seems to me exceedingly unlikely that the state court held the statute unconstitutional because it believed that the "best interests" standard imposes "hardly any limit" on courts' discretion. See n. 5, *infra*.

and from the myriad other state statutes and court decisions at least nominally applying the same standard.[5] Thus, I believe that JUSTICE SOUTER's conclusion that the statute unconstitutionally imbues state trial court judges with "'too much discretion in *every* case,'" *ante,* at 78, n. 3 (opinion concurring in judgment) (quoting *Chicago* v. *Morales,* 527 U. S. 41, 71 (1999) (BREYER, J., concurring)), is premature.

We are thus presented with the unconstrued terms of a state statute and a State Supreme Court opinion that, in my view, significantly misstates the effect of the Federal Constitution upon any construction of that statute. Given that posture, I believe the Court should identify and correct the two flaws in the reasoning of the state court's majority opin-

---

[5] The phrase "best interests of the child" appears in no less than 10 current Washington state statutory provisions governing determinations from guardianship to termination to custody to adoption. See, *e. g.,* Wash. Rev. Code § 26.09.240(6) (Supp. 1996) (amended version of visitation statute enumerating eight factors courts may consider in evaluating a child's best interests); § 26.09.002 (in cases of parental separation or divorce "best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care"; "best interest of the child is ordinarily served when the existing pattern of interaction between a parent and child is altered only to the extent necessitated by the changed relationship of the parents or as required to protect the child from physical, mental, or emotional harm"); § 26.10.100 ("The court shall determine custody in accordance with the best interests of the child"). Indeed, the Washington state courts have invoked the standard on numerous occasions in applying these statutory provisions—just as if the phrase had quite specific and apparent meaning. See, *e. g., In re McDoyle,* 122 Wash. 2d 604, 859 P. 2d 1239 (1993) (upholding trial court "best interest" assessment in custody dispute); *McDaniels* v. *Carlson,* 108 Wash. 2d 299, 310, 738 P. 2d 254, 261 (1987) (elucidating "best interests" standard in paternity suit context). More broadly, a search of current state custody and visitation laws reveals fully 698 separate references to the "best interest of the child" standard, a number that, at a minimum, should give the Court some pause before it upholds a decision implying that those words, on their face, may be too boundless to pass muster under the Federal Constitution.

ion, and remand for further review of the trial court's disposition of this specific case.

## II

In my view, the State Supreme Court erred in its federal constitutional analysis because neither the provision granting "any person" the right to petition the court for visitation, 137 Wash. 2d, at 20, 969 P. 2d, at 30, nor the absence of a provision requiring a "threshold . . . finding of harm to the child," *ibid.*, provides a sufficient basis for holding that the statute is invalid in all its applications.   I believe that a facial challenge should fail whenever a statute has "a 'plainly legitimate sweep,'" *Washington* v. *Glucksberg,* 521 U. S. 702, 739–740, and n. 7 (1997) (STEVENS, J., concurring in judgment).[6]   Under the Washington statute, there are plainly any number of cases—indeed, one suspects, the most common to arise—in which the "person" among "any" seeking visitation is a once-custodial caregiver, an intimate relation, or even a genetic parent.   Even the Court would seem to agree that in many circumstances, it would be constitutionally permissible for a court to award some visitation of a child to a parent or previous caregiver in cases of parental separation or divorce, cases of disputed custody, cases involving temporary foster care or guardianship, and so forth.   As the statute plainly sweeps in a great deal of the permissible, the State Supreme Court majority incorrectly concluded that a statute authorizing "any person" to file a petition seeking visitation privileges would invariably run afoul of the Fourteenth Amendment.

The second key aspect of the Washington Supreme Court's holding—that the Federal Constitution requires a showing of actual or potential "harm" to the child before a court may

---

[6] It necessarily follows that under the far more stringent demands suggested by the majority in *United States* v. *Salerno,* 481 U. S. 739, 745 (1987) (plaintiff seeking facial invalidation "must establish that no set of circumstances exists under which the Act would be valid"), respondent's facial challenge must fail.

order visitation continued over a parent's objections—finds no support in this Court's case law. While, as the Court recognizes, the Federal Constitution certainly protects the parent-child relationship from arbitrary impairment by the State, see *infra* this page and 87–88, we have never held that the parent's liberty interest in this relationship is so inflexible as to establish a rigid constitutional shield, protecting every arbitrary parental decision from any challenge absent a threshold finding of harm.[7] The presumption that parental decisions generally serve the best interests of their children is sound, and clearly in the normal case the parent's interest is paramount. But even a fit parent is capable of treating a child like a mere possession.

Cases like this do not present a bipolar struggle between the parents and the State over who has final authority to determine what is in a child's best interests. There is at a minimum a third individual, whose interests are implicated in every case to which the statute applies—the child.

It has become standard practice in our substantive due process jurisprudence to begin our analysis with an identification of the "fundamental" liberty interests implicated by the challenged state action. See, *e. g., ante,* at 65–66 (opinion of O'CONNOR, J.); *Washington* v. *Glucksberg,* 521 U. S. 702 (1997); *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833 (1992). My colleagues are of course correct to recognize that the right of a parent to maintain a relationship with his or her child is among the interests in-

---

[7] The suggestion by JUSTICE THOMAS that this case may be resolved solely with reference to our decision in *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535 (1925), is unpersuasive. *Pierce* involved a parent's choice whether to send a child to public or private school. While that case is a source of broad language about the scope of parents' due process rights with respect to their children, the constitutional principles and interests involved in the schooling context do not necessarily have parallel implications in this family law visitation context, in which multiple overlapping and competing prerogatives of various plausibly interested parties are at stake.

cluded most often in the constellation of liberties protected through the Fourteenth Amendment. *Ante,* at 65–66 (opinion of O'CONNOR, J.). Our cases leave no doubt that parents have a fundamental liberty interest in caring for and guiding their children, and a corresponding privacy interest—absent exceptional circumstances—in doing so without the undue interference of strangers to them and to their child. Moreover, and critical in this case, our cases applying this principle have explained that with this constitutional liberty comes a presumption (albeit a rebuttable one) that "natural bonds of affection lead parents to act in the best interests of their children." *Parham* v. *J. R.,* 442 U. S. 584, 602 (1979); see also *Casey,* 505 U. S., at 895; *Santosky* v. *Kramer,* 455 U. S. 745, 759 (1982) (State may not presume, at factfinding stage of parental rights termination proceeding, that interests of parent and child diverge); see also *ante,* at 68–69 (opinion of O'CONNOR, J.).

Despite this Court's repeated recognition of these significant parental liberty interests, these interests have never been seen to be without limits. In *Lehr* v. *Robertson,* 463 U. S. 248 (1983), for example, this Court held that a putative biological father who had never established an actual relationship with his child did not have a constitutional right to notice of his child's adoption by the man who had married the child's mother. As this Court had recognized in an earlier case, a parent's liberty interests "'do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.'" *Id.,* at 260 (quoting *Caban* v. *Mohammed,* 441 U. S. 380, 397 (1979)).

Conversely, in *Michael H.* v. *Gerald D.,* 491 U. S. 110 (1989), this Court concluded that despite both biological parenthood and an established relationship with a young child, a father's due process liberty interest in maintaining some connection with that child was not sufficiently powerful to overcome a state statutory presumption that the husband of the child's mother was the child's parent. As a result of the

presumption, the biological father could be denied even visitation with the child because, as a matter of state law, he was not a "parent." A plurality of this Court there recognized that the parental liberty interest was a function, not simply of "isolated factors" such as biology and intimate connection, but of the broader and apparently independent interest in family. See, *e. g., id.,* at 123; see also *Lehr,* 463 U. S., at 261; *Smith* v. *Organization of Foster Families For Equality & Reform,* 431 U. S. 816, 842–847 (1977); *Moore* v. *East Cleveland,* 431 U. S. 494, 498–504 (1977).

A parent's rights with respect to her child have thus never been regarded as absolute, but rather are limited by the existence of an actual, developed relationship with a child, and are tied to the presence or absence of some embodiment of family. These limitations have arisen, not simply out of the definition of parenthood itself, but because of this Court's assumption that a parent's interests in a child must be balanced against the State's long-recognized interests as *parens patriae,* see, *e. g., Reno* v. *Flores,* 507 U. S. 292, 303–304 (1993); *Santosky* v. *Kramer,* 455 U. S., at 766; *Parham,* 442 U. S., at 605; *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (1944), and, critically, the child's own complementary interest in preserving relationships that serve her welfare and protection, *Santosky,* 455 U. S., at 760.

While this Court has not yet had occasion to elucidate the nature of a child's liberty interests in preserving established familial or family-like bonds, 491 U. S., at 130 (reserving the question), it seems to me extremely likely that, to the extent parents and families have fundamental liberty interests in preserving such intimate relationships, so, too, do children have these interests, and so, too, must their interests be balanced in the equation.[8] At a minimum, our prior cases rec-

---

[8] This Court has on numerous occasions acknowledged that children are in many circumstances possessed of constitutionally protected rights and liberties. See *Parham* v. *J. R.,* 442 U. S. 584, 600 (1979) (liberty interest in avoiding involuntary confinement); *Planned Parenthood of Central*

ognizing that children are, generally speaking, constitutionally protected actors require that this Court reject any suggestion that when it comes to parental rights, children are so much chattel. See *ante*, at 64–65 (opinion of O'CONNOR, J.) (describing States' recognition of "an independent third-party interest in a child"). The constitutional protection against arbitrary state interference with parental rights should not be extended to prevent the States from protecting children against the arbitrary exercise of parental authority that is not in fact motivated by an interest in the welfare of the child.[9]

This is not, of course, to suggest that a child's liberty interest in maintaining contact with a particular individual is to be treated invariably as on a par with that child's parents' contrary interests. Because our substantive due process case law includes a strong presumption that a parent will act

*Mo.* v. *Danforth*, 428 U. S. 52, 74 (1976) ("Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights"); *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 506–507 (1969) (First Amendment right to political speech); *In re Gault*, 387 U. S. 1, 13 (1967) (due process rights in criminal proceedings).

[9] Cf., *e. g.*, *Wisconsin* v. *Yoder*, 406 U. S. 205, 244–246 (1972) (Douglas, J., dissenting) ("While the parents, absent dissent, normally speak for the entire family, the education of the child is a matter on which the child will often have decided views. He may want to be a pianist or an astronaut or an oceanographer. To do so he will have to break from the Amish tradition. It is the future of the student, not the future of the parents, that is imperiled by today's decision. If a parent keeps his child out of school beyond the grade school, then the child will be forever barred from entry into the new and amazing world of diversity that we have today. . . . It is the student's judgment, not his parents', that is essential if we are to give full meaning to what we have said about the Bill of Rights and of the right of students to be masters of their own destiny"). The majority's disagreement with Justice Douglas in that case turned not on any contrary view of children's interest in their own education, but on the impact of the Free Exercise Clause of the First Amendment on its analysis of school-related decisions by the Amish community.

in the best interest of her child, it would be necessary, were the state appellate courts actually to confront a challenge to the statute as applied, to consider·whether the trial court's assessment of the "best interest of the child" incorporated that presumption. Neither would I decide whether the trial court applied Washington's statute in a constitutional way in this case, although, as I have explained, n. 3, *supra*, I think the outcome of this determination is far from clear. For the purpose of a facial challenge like this, I think it safe to assume that trial judges usually give great deference to parents' wishes, and I am not persuaded otherwise here.

But presumptions notwithstanding, we should recognize that there may be circumstances in which a child has a stronger interest at stake than mere protection from serious harm caused by the termination of visitation by a "person" other than a parent. The almost infinite variety of family relationships that pervade our ever-changing society strongly counsel against the creation by this Court of a constitutional rule that treats a biological parent's liberty interest in the care and supervision of her child as an isolated right that may be exercised arbitrarily. It is indisputably the business of the States, rather than a federal court employing a national standard, to assess in the first instance the relative importance of the conflicting interests that give rise to disputes such as this.[10]   Far from guaranteeing that

---

[10] See *Palmore* v. *Sidoti*, 466 U. S. 429, 431 (1984) ("The judgment of a state court determining or reviewing a child custody decision is not ordinarily a likely candidate for review by this Court"); cf. *Collins* v. *Harker Heights*, 503 U. S. 115, 128 (1992) (matters involving competing and multifaceted social and policy decisions best left to local decisionmaking); *Regents of Univ. of Mich.* v. *Ewing*, 474 U. S. 214, 226 (1985) (emphasizing our "reluctance to trench on the prerogatives of state and local educational institutions" as federal courts are ill-suited to "evaluate the substance of the multitude of academic decisions that are made daily by" experts in the field evaluating cumulative information). That caution is never more essential than in the realm of family and intimate relations.   In part, this principle is based on long-established, if somewhat arbitrary, tradition in

parents' interests will be trammeled in the sweep of cases arising under the statute, the Washington law merely gives an individual—with whom a child may have an established relationship—the procedural right to ask the State to act as arbiter, through the entirely well-known best-interests standard, between the parent's protected interests and the child's. It seems clear to me that the Due Process Clause of the Fourteenth Amendment leaves room for States to consider the impact on a child of possibly arbitrary parental decisions that neither serve nor are motivated by the best interests of the child.

Accordingly, I respectfully dissent.

JUSTICE SCALIA, dissenting.

In my view, a right of parents to direct the upbringing of their children is among the "unalienable Rights" with which the Declaration of Independence proclaims "all men . . . are endowed by their Creator." And in my view that right is also among the "othe[r] [rights] retained by the people" which the Ninth Amendment says the Constitution's enumeration of rights "shall not be construed to deny or disparage." The Declaration of Independence, however, is not a legal prescription conferring powers upon the courts; and the Constitution's refusal to "deny or disparage" other rights is far removed from affirming any one of them, and even further removed from authorizing judges to identify what they might be, and to enforce the judges' list against laws duly enacted by the people. Consequently, while I would think it entirely compatible with the commitment to representative

allocating responsibility for resolving disputes of various kinds in our federal system. *Ankenbrandt* v. *Richards*, 504 U. S. 689 (1992). But the instinct against overregularizing decisions about personal relations is sustained on firmer ground than mere tradition. It flows in equal part from the premise that people and their intimate associations are complex and particular, and imposing a rigid template upon them all risks severing bonds our society would do well to preserve.

democracy set forth in the founding documents to argue, in legislative chambers or in electoral campaigns, that the State has *no power* to interfere with parents' authority over the rearing of their children, I do not believe that the power which the Constitution confers upon me *as a judge* entitles me to deny legal effect to laws that (in my view) infringe upon what is (in my view) that unenumerated right.

Only three holdings of this Court rest in whole or in part upon a substantive constitutional right of parents to direct the upbringing of their children[1]—two of them from an era rich in substantive due process holdings that have since been repudiated. See *Meyer* v. *Nebraska*, 262 U. S. 390, 399, 401 (1923); *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534–535 (1925); *Wisconsin* v. *Yoder*, 406 U. S. 205, 232–233 (1972). Cf. *West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379 (1937) (overruling *Adkins* v. *Children's Hospital of D. C.*, 261 U. S. 525 (1923)). The sheer diversity of today's opinions persuades me that the theory of unenumerated parental rights underlying these three cases has small claim to *stare decisis* protection. A legal principle that can be thought to produce such diverse outcomes in the relatively simple case before us here is not a legal principle that has induced substantial reliance. While I would not now overrule those earlier cases (that has not been urged), neither would I extend the theory upon which they rested to this new context.

Judicial vindication of "parental rights" under a Constitution that does not even mention them requires (as JUSTICE KENNEDY's opinion rightly points out) not only a judicially crafted definition of parents, but also—unless, as no one be-

---

[1] Whether parental rights constitute a "liberty" interest for purposes of procedural due process is a somewhat different question not implicated here. *Stanley* v. *Illinois*, 405 U. S. 645 (1972), purports to rest in part upon that proposition, see *id.*, at 651–652; but see *Michael H.* v. *Gerald D.*, 491 U. S. 110, 120–121 (1989) (plurality opinion), though the holding is independently supported on equal protection grounds, see *Stanley, supra,* at 658.

lieves, the parental rights are to be absolute—judicially approved assessments of "harm to the child" and judicially defined gradations of other persons (grandparents, extended family, adoptive family in an adoption later found to be invalid, long-term guardians, etc.) who may have some claim against the wishes of the parents. If we embrace this unenumerated right, I think it obvious—whether we affirm or reverse the judgment here, or remand as JUSTICE STEVENS or JUSTICE KENNEDY would do—that we will be ushering in a new regime of judicially prescribed, and federally prescribed, family law. I have no reason to believe that federal judges will be better at this than state legislatures; and state legislatures have the great advantages of doing harm in a more circumscribed area, of being able to correct their mistakes in a flash, and of being removable by the people.[2]

For these reasons, I would reverse the judgment below.

JUSTICE KENNEDY, dissenting.

The Supreme Court of Washington has determined that petitioners Jenifer and Gary Troxel have standing under state law to seek court-ordered visitation with their grandchildren, notwithstanding the objections of the children's parent, respondent Tommie Granville. The statute relied upon provides:

> "Any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances." Wash. Rev. Code § 26.10.160(3) (1994).

---

[2] I note that respondent is asserting only, *on her own behalf*, a substantive due process right to direct the upbringing of her own children, and is not asserting, *on behalf of her children*, their First Amendment rights of association or free exercise. I therefore do not have occasion to consider whether, and under what circumstances, the parent could assert the latter enumerated rights.

After acknowledging this statutory right to sue for visitation, the State Supreme Court invalidated the statute as violative of the United States Constitution, because it interfered with a parent's right to raise his or her child free from unwarranted interference. *In re Smith*, 137 Wash. 2d 1, 969 P. 2d 21 (1998). Although parts of the court's decision may be open to differing interpretations, it seems to be agreed that the court invalidated the statute on its face, ruling it a nullity.

The first flaw the State Supreme Court found in the statute is that it allows an award of visitation to a nonparent without a finding that harm to the child would result if visitation were withheld; and the second is that the statute allows any person to seek visitation at any time. In my view the first theory is too broad to be correct, as it appears to contemplate that the best interests of the child standard may not be applied in any visitation case. I acknowledge the distinct possibility that visitation cases may arise where, considering the absence of other protection for the parent under state laws and procedures, the best interests of the child standard would give insufficient protection to the parent's constitutional right to raise the child without undue intervention by the State; but it is quite a different matter to say, as I understand the Supreme Court of Washington to have said, that a harm to the child standard is required in every instance.

Given the error I see in the State Supreme Court's central conclusion that the best interests of the child standard is never appropriate in third-party visitation cases, that court should have the first opportunity to reconsider this case. I would remand the case to the state court for further proceedings. If it then found the statute has been applied in an unconstitutional manner because the best interests of the child standard gives insufficient protection to a parent under the circumstances of this case, or if it again declared the statute a nullity because the statute seems to allow any person

at all to seek visitation at any time, the decision would present other issues which may or may not warrant further review in this Court. These include not only the protection the Constitution gives parents against state-ordered visitation but also the extent to which federal rules for facial challenges to statutes control in state courts. These matters, however, should await some further case. The judgment now under review should be vacated and remanded on the sole ground that the harm ruling that was so central to the Supreme Court of Washington's decision was error, given its broad formulation.

Turning to the question whether harm to the child must be the controlling standard in every visitation proceeding, there is a beginning point that commands general, perhaps unanimous, agreement in our separate opinions: As our case law has developed, the custodial parent has a constitutional right to determine, without undue interference by the State, how best to raise, nurture, and educate the child. The parental right stems from the liberty protected by the Due Process Clause of the Fourteenth Amendment. See, *e. g.,* *Meyer* v. *Nebraska,* 262 U. S. 390, 399, 401 (1923); *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534–535 (1925); *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (1944); *Stanley* v. *Illinois,* 405 U. S. 645, 651–652 (1972); *Wisconsin* v. *Yoder,* 406 U. S. 205, 232–233 (1972); *Santosky* v. *Kramer,* 455 U. S. 745, 753–754 (1982). *Pierce* and *Meyer,* had they been decided in recent times, may well have been grounded upon First Amendment principles protecting freedom of speech, belief, and religion. Their formulation and subsequent interpretation have been quite different, of course; and they long have been interpreted to have found in Fourteenth Amendment concepts of liberty an independent right of the parent in the "custody, care and nurture of the child," free from state intervention. *Prince, supra,* at 166. The principle exists, then, in broad formulation; yet courts must use considerable restraint, including careful adherence to the incremental in-

struction given by the precise facts of particular cases, as they seek to give further and more precise definition to the right.

The State Supreme Court sought to give content to the parent's right by announcing a categorical rule that third parties who seek visitation must always prove the denial of visitation would harm the child. After reviewing some of the relevant precedents, the Supreme Court of Washington concluded "'[t]he requirement of harm is the sole protection that parents have against pervasive state interference in the parenting process.'" 137 Wash. 2d, at 19–20, 969 P. 2d, at 30 (quoting *Hawk* v. *Hawk*, 855 S. W. 2d 573, 580 (Tenn. 1993)). For that reason, "[s]hort of preventing harm to the child," the court considered the best interests of the child to be "insufficient to serve as a compelling state interest overruling a parent's fundamental rights." 137 Wash. 2d, at 20, 969 P. 2d, at 30.

While it might be argued as an abstract matter that in some sense the child is always harmed if his or her best interests are not considered, the law of domestic relations, as it has evolved to this point, treats as distinct the two standards, one harm to the child and the other the best interests of the child. The judgment of the Supreme Court of Washington rests on that assumption, and I, too, shall assume that there are real and consequential differences between the two standards.

On the question whether one standard must always take precedence over the other in order to protect the right of the parent or parents, "[o]ur Nation's history, legal traditions, and practices" do not give us clear or definitive answers. *Washington* v. *Glucksberg*, 521 U. S. 702, 721 (1997). The consensus among courts and commentators is that at least through the 19th century there was no legal right of visitation; court-ordered visitation appears to be a 20th-century phenomenon. See, *e. g.,* 1 D. Kramer, Legal Rights of Children 124, 136 (2d ed. 1994); 2 J. Atkinson, Modern

Child Custody Practice § 8.10 (1986). A case often cited as one of the earliest visitation decisions, *Succession of Reiss*, 46 La. Ann. 347, 353, 15 So. 151, 152 (1894), explained that "the obligation ordinarily to visit grandparents is moral and not legal"—a conclusion which appears consistent with that of American common-law jurisdictions of the time. Early 20th-century exceptions did occur, often in cases where a relative had acted in a parental capacity, or where one of a child's parents had died. See *Douglass* v. *Merriman*, 163 S. C. 210, 161 S. E. 452 (1931) (maternal grandparent awarded visitation with child when custody was awarded to father; mother had died); *Solomon* v. *Solomon*, 319 Ill. App. 618, 49 N. E. 2d 807 (1943) (paternal grandparents could be given visitation with child in custody of his mother when their son was stationed abroad; case remanded for fitness hearing); *Consaul* v. *Consaul*, 63 N. Y. S. 2d 688 (Sup. Ct. Jefferson Cty. 1946) (paternal grandparents awarded visitation with child in custody of his mother; father had become incompetent). As a general matter, however, contemporary state-court decisions acknowledge that "[h]istorically, grandparents had no legal right of visitation," *Campbell* v. *Campbell*, 896 P. 2d 635, 642, n. 15 (Utah App. 1995), and it is safe to assume other third parties would have fared no better in court.

To say that third parties have had no historical right to petition for visitation does not necessarily imply, as the Supreme Court of Washington concluded, that a parent has a constitutional right to prevent visitation in all cases not involving harm. True, this Court has acknowledged that States have the authority to intervene to prevent harm to children, see, *e. g., Prince, supra,* at 168–169; *Yoder, supra,* at 233–234, but that is not the same as saying that a heightened harm to the child standard must be satisfied in every case in which a third party seeks a visitation order. It is also true that the law's traditional presumption has been "that natural bonds of affection lead parents to act in the

best interests of their children," *Parham* v. *J. R.*, 442 U. S. 584, 602 (1979); and "[s]imply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state," *id.*, at 603. The State Supreme Court's conclusion that the Constitution forbids the application of the best interests of the child standard in any visitation proceeding, however, appears to rest upon assumptions the Constitution does not require.

My principal concern is that the holding seems to proceed from the assumption that the parent or parents who resist visitation have always been the child's primary caregivers and that the third parties who seek visitation have no legitimate and established relationship with the child. That idea, in turn, appears influenced by the concept that the conventional nuclear family ought to establish the visitation standard for every domestic relations case. As we all know, this is simply not the structure or prevailing condition in many households. See, *e. g.*, *Moore* v. *East Cleveland*, 431 U. S. 494 (1977). For many boys and girls a traditional family with two or even one permanent and caring parent is simply not the reality of their childhood. This may be so whether their childhood has been marked by tragedy or filled with considerable happiness and fulfillment.

Cases are sure to arise—perhaps a substantial number of cases—in which a third party, by acting in a caregiving role over a significant period of time, has developed a relationship with a child which is not necessarily subject to absolute parental veto. See *Michael H.* v. *Gerald D.*, 491 U. S. 110 (1989) (putative natural father not entitled to rebut state-law presumption that child born in a marriage is a child of the marriage); *Quilloin* v. *Walcott*, 434 U. S. 246 (1978) (best interests standard sufficient in adoption proceeding to protect interests of natural father who had not legitimated the child); see also *Lehr* v. *Robertson*, 463 U. S. 248, 261 (1983) (" '[T]he importance of the familial relationship, to the individuals in-

volved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot[ing] a way of life" through the instruction of children . . . as well as from the fact of blood relationship'" (quoting *Smith* v. *Organization of Foster Families For Equality & Reform*, 431 U. S. 816, 844 (1977), in turn quoting *Yoder*, 406 U. S., at 231–233)). Some pre-existing relationships, then, serve to identify persons who have a strong attachment to the child with the concomitant motivation to act in a responsible way to ensure the child's welfare. As the State Supreme Court was correct to acknowledge, those relationships can be so enduring that "in certain circumstances where a child has enjoyed a substantial relationship with a third person, arbitrarily depriving the child of the relationship could cause severe psychological harm to the child," 137 Wash. 2d, at 20, 969 P. 2d, at 30; and harm to the adult may also ensue. In the design and elaboration of their visitation laws, States may be entitled to consider that certain relationships are such that to avoid the risk of harm, a best interests standard can be employed by their domestic relations courts in some circumstances.

Indeed, contemporary practice should give us some pause before rejecting the best interests of the child standard in all third-party visitation cases, as the Washington court has done. The standard has been recognized for many years as a basic tool of domestic relations law in visitation proceedings. Since 1965 all 50 States have enacted a third-party visitation statute of some sort. See *ante*, at 73–74, n. (plurality opinion). Each of these statutes, save one, permits a court order to issue in certain cases if visitation is found to be in the best interests of the child. While it is unnecessary for us to consider the constitutionality of any particular provision in the case now before us, it can be noted that the statutes also include a variety of methods for limiting parents' exposure to third-party visitation petitions and for ensuring parental decisions are given respect. Many States

limit the identity of permissible petitioners by restricting visitation petitions to grandparents, or by requiring petitioners to show a substantial relationship with a child, or both. See, *e. g.,* Kan. Stat. Ann. § 38–129 (1993 and Supp. 1998) (grandparent visitation authorized under certain circumstances if a substantial relationship exists); N. C. Gen. Stat. §§ 50–13.2, 50–13.2A, 50–13.5 (1999) (same); Iowa Code § 598.35 (Supp. 1999) (same; visitation also authorized for great-grandparents); Wis. Stat. § 767.245 (Supp. 1999) (visitation authorized under certain circumstances for "a grandparent, greatgrandparent, stepparent or person who has maintained a relationship similar to a parent-child relationship with the child"). The statutes vary in other respects—for instance, some permit visitation petitions when there has been a change in circumstances such as divorce or death of a parent, see, *e. g.,* N. H. Rev. Stat. Ann. § 458:17–d (1992), and some apply a presumption that parental decisions should control, see, *e. g.,* Cal. Fam. Code Ann. §§ 3104(e)–(f) (West 1994); R. I. Gen. Laws § 15–5–24.3(a)(2)(v) (Supp. 1999). Georgia's is the sole state legislature to have adopted a general harm to the child standard, see Ga. Code Ann. § 19–7–3(c) (1999), and it did so only after the Georgia Supreme Court held the State's prior visitation statute invalid under the Federal and Georgia Constitutions, see *Brooks* v. *Parkerson,* 265 Ga. 189, 454 S. E. 2d 769, cert. denied, 516 U. S. 942 (1995).

In light of the inconclusive historical record and case law, as well as the almost universal adoption of the best interests standard for visitation disputes, I would be hard pressed to conclude the right to be free of such review in all cases is itself " 'implicit in the concept of ordered liberty.' " *Glucksberg,* 521 U. S., at 721 (quoting *Palko* v. *Connecticut,* 302 U. S. 319, 325 (1937)). In my view, it would be more appropriate to conclude that the constitutionality of the application of the best interests standard depends on more specific factors. In short, a fit parent's right vis-à-vis a complete

stranger is one thing; her right vis-à-vis another parent or a *de facto* parent may be another. The protection the Constitution requires, then, must be elaborated with care, using the discipline and instruction of the case law system. We must keep in mind that family courts in the 50 States confront these factual variations each day, and are best situated to consider the unpredictable, yet inevitable, issues that arise. Cf. *Ankenbrandt* v. *Richards,* 504 U. S. 689, 703–704 (1992).

It must be recognized, of course, that a domestic relations proceeding in and of itself can constitute state intervention that is so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated. The best interests of the child standard has at times been criticized as indeterminate, leading to unpredictable results. See, *e. g.,* American Law Institute, Principles of the Law of Family Dissolution 2, and n. 2 (Tent. Draft No. 3, Mar. 20, 1998). If a single parent who is struggling to raise a child is faced with visitation demands from a third party, the attorney's fees alone might destroy her hopes and plans for the child's future. Our system must confront more often the reality that litigation can itself be so disruptive that constitutional protection may be required; and I do not discount the possibility that in some instances the best interests of the child standard may provide insufficient protection to the parent-child relationship. We owe it to the Nation's domestic relations legal structure, however, to proceed with caution.

It should suffice in this case to reverse the holding of the State Supreme Court that the application of the best interests of the child standard is always unconstitutional in third-party visitation cases. Whether, under the circumstances of this case, the order requiring visitation over the objection of this fit parent violated the Constitution ought to be reserved for further proceedings. Because of its sweeping ruling re-

quiring the harm to the child standard, the Supreme Court of Washington did not have the occasion to address the specific visitation order the Troxels obtained. More specific guidance should await a case in which a State's highest court has considered all of the facts in the course of elaborating the protection afforded to parents by the laws of the State and by the Constitution itself. Furthermore, in my view, we need not address whether, under the correct constitutional standards, the Washington statute can be invalidated on its face. This question, too, ought to be addressed by the state court in the first instance.

In my view the judgment under review should be vacated and the case remanded for further proceedings.