**Kelly NEIN, Appellant**

v.

**Paul COLUMBIA and Patti Columbia, Appellees**

**NO. 2016-CA-000681-ME**

Court of Appeals of Kentucky.

MARCH 3, 2017; 10:00 A.M.

BRIEF FOR APPELLANT: Brian N. Thomas, Winchester, Kentucky.

BRIEF FOR APPELLEES: Kimberly Carter Blair, Winchester, Kentucky.

BEFORE: KRAMER, CHIEF JUDGE; COMBS AND JONES, JUDGES.

## OPINION

JONES, JUDGE:

Appellant, Kelly Nein, appeals from the Clark Family Court's order granting Appellees, Paul and Patti Columbia, grandparents' visitation rights with her son, J.T.C. Kelly argues that the family court's decision was inconsistent with the evidence presented. She further argues that the trial court improperly allowed the appointed *Guardian ad Litem* ("GAL") to act as both a friend of the court and a GAL, as evidenced by the alleged adoption of the GAL's recommendations to the court in the court's order. After review of the record, we affirm the order of the Clark Family Court.

## I. BACKGROUND

J.T.C. was born to Kelly Nein and Stephen Columbia in 2005, while both parents were young college students. Kelly and Stephen were never married. While Stephen acknowledges J.T.C. as his son, he has never had custody of the child, has never paid child support, and currently resides in South America. Stephen is not a party to this appeal.

About four months after J.T.C.'s birth, Stephen's parents, Paul and Patti Columbia, discovered that J.T.C. was their grandson. While the Columbias initially intended to fulfill traditional grandparent roles, their involvement in J.T.C.'s life quickly increased. When Kelly went back to school to finish up her college degree, Patti and Paul provided child care services for her. This consisted of J.T.C. spending most days with Patti and Paul, as well as several overnight visits throughout the week and on weekends.

This care continued even after Kelly had finished college. The Columbias were often the ones responsible for taking J.T.C. to the doctor or dentist, and routinely paid the expenses for these visits and for J.T.C.'s medication. When J.T.C. began attending pre-school, the Columbias paid most of his tuition expenses. As J.T.C. entered elementary school, the Columbias' involvement in his life began to increase even more. The Columbias would pick J.T.C. up from school each day. They would often pay for J.T.C.'s lunches at school, or pack him a lunch when he had stayed overnight at their house. Patti volunteered as a homeroom mother for J.T.C.'s first-grade class, and was generally at his school five days a week. When J.T.C. began playing sports, Paul helped coach his teams, paid entrance fees and fees for equipment, and practiced sports with J.T.C. at home.

If J.T.C. felt sick at school, he would always ask for his teacher to call either Paul or Patti. Even when J.T.C. attended school in Lexington one year, the Columbias would make the drive to pick him up after school or bring him items of which he was in need. J.T.C.'s teachers noted that it was usually Paul who would sign J.T.C.'s homework log, and that Paul would frequently communicate with the teachers regarding J.T.C.'s schoolwork.

For most of J.T.C.'s life, Kelly and the Columbias had a friendly, even familial, relationship. In the summer of 2014, however, Kelly began decreasing her and J.T.C.'s contact with the Columbias. The most significant example of this was Kelly's refusal to attend the Columbias' daughter's wedding, despite the fact that J.T.C. was in the ceremony, claiming that

it would be unfair to her fiancé and family. That August, the Columbias discovered that Kelly had sent Paul's elderly mother an email asking for $2,000. In the email, Kelly explained that she was behind on her bills, was unable to manage herself emotionally or financially, and was unable to ask her own parents for help as they were going through a divorce—a statement that she admitted was a lie at the final hearing. She further asked Paul's mother not to disclose to the Columbias that she had made this request. When the Columbias found out about the email, they offered to loan Kelly the money instead, but she refused their offer.

As time passed, Kelly continued limiting J.T.C.'s time with the Columbias. Although J.T.C. had previously spent all snow days with the Columbias, Kelly refused to allow him to do so during the 2014-2015 schoolyear. On one occasion, Kelly came to the Columbias' house to pick J.T.C. up in the middle of the night. This growing tension culminated at the end of J.T.C.'s fourth-grade year when Kelly informed the Columbias, in J.T.C.'s presence, that she no longer wished for them to spend significant time with J.T.C. Kelly claimed that the reason for this decision was her desire for J.T.C. to spend more time with her, her fiancé, and J.T.C.'s half-sister. She also testified that J.T.C.'s behavior worsens when he returns home after spending time with the Columbias—he talks back to her, refuses to do chores, and is mean to his younger half-sister.

The Columbias initially tried to resolve the matter by sending Kelly a letter through their prior attorney. This letter only caused Kelly to reduce the Columbias' time with J.T.C. almost completely—Kelly claims she told the Columbias they would not see J.T.C. again until this matter was resolved; the Columbias claim Kelly told them they would never see J.T.C. again,

without qualification. Around this time, the Columbias learned that Kelly had pled guilty to a felony theft by deception charge involving her former employer.

Shortly thereafter, on May 22, 2014, the Columbias filed a Petition for Custody/Grandparent Visitation. The custody request was subsequently dropped, leaving only the petition for grandparent visitation. Following mediation, Kelly and the Columbias agreed to a temporary time-sharing order. Kelly did not comply with this order, taking J.T.C. on vacation during the week scheduled for the Columbias to take him on vacation. The court ordered that the missed days be made up; however, at the time of the final hearing they had not been rescheduled. Upon the Columbias' motion, a GAL was appointed to represent J.T.C.'s interests.

The court held a hearing on February 24, 2016. At the hearing, the court heard from Kelly, Paul, Patti, and two of J.T.C.'s elementary school teachers. All attorneys, including the GAL, were permitted to cross-examine each of the witnesses. Additionally, the GAL conducted a direct examination of J.T.C. While the other parties and attorneys were in a separate room at the time of the examination, they watched J.T.C.'s testimony live via video feed and were permitted to tender their own questions and preserve any objections for the record. Following closing arguments by all parties, the court entered an order from the bench whereby it granted the Columbias their requested visitation with J.T.C., and asked all parties to tender proposed findings of facts and orders to the court.

Before either party had tendered a proposed order to the court, the Columbias moved to hold Kelly in contempt for violation of the court's February 25, 2016, bench order. A contempt hearing was held, and the court entered a handwritten order that outlined the visitation schedule on

March 22, 2016. On April 12, 2016, the court entered its Findings of Facts, Conclusions of Law, and Order Granting Grandparents' Visitation Rights.

This appeal follows.

## II. STANDARD OF REVIEW

■ Trial courts are given broad discretion in child custody and visitation matters. *See Drury v. Drury*, 32 S.W.3d 521, 525 (Ky. App. 2000). Absent an abuse of discretion, we will not disturb the court's judgment. *Young v. Holmes*, 295 S.W.3d 144, 146 (Ky. App. 2009). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citations omitted).

## III. ANALYSIS

■ Kelly first argues that the trial court abused its discretion in granting the Columbias visitation with J.T.C. over her objection. Kelly contends that the family court made its decision arbitrarily, rather than using legal standards. Kelly's main position is that, after considering all of the evidence in combination with her objections to visitation, the family court's order is clearly erroneous and flies in the face of evidence.

KRS[1] 405.021 gives statutory authority for courts to grant reasonable visitation rights to grandparents. The statute simply states that the court may grant grandparent visitation if it determines that it is in the child's best interest to do so. However, this statutory rule is impacted by constitutional issues, namely a parent's fundamental right to raise her child—including making decisions concerning the care, custody, and control of the child—without government interference. *See Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). *Troxel* recognized that "there is a presumption that fit parents act in the best interests of their children[,]" and that "if a fit parent's decision ... becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination." *Id.* at 530 U.S. 68-70, 120 S.Ct. 2061-63.

In *Walker v. Blair*, our Supreme Court analyzed KRS 405.021 in light the *Troxel* decision. 382 S.W.3d 862 (Ky. 2012). The Court held that, in accordance with *Troxel*, "a fit parent is presumed to act in the best interest of the child." *Id.* at 866. Further, the Court indicated that "[a] grandparent petitioning for child visitation contrary to the wishes of the child's parent can overcome this presumption of validity only with clear and convincing evidence that granting visitation to the grandparent is in the child's best interest." *Id.* In other words, while the petitioning grandparent need not show that denying visitation will harm the child, they must "show that the fit parent is clearly mistaken in the belief that grandparent visitation is not in the child's best interest." *Id.* at 871. If the grandparent is unable to make this showing, "then parental opposition alone is sufficient to deny the grandparent visitation." *Id.*

■ The *Walker* court then set out a list of factors that a court can consider in determining whether grandparent visitation is in the child's best interest. In so doing, the Court acknowledged and expanded on the modified best interest standard set out by this court in *Vibbert v. Vibbert*, 144 S.W.3d 292 (Ky. App. 2004). Those factors include, but are not limited to:

---

1. Kentucky Revised Statutes.

1) the nature and stability of the relationship between the child and the grandparent seeking visitation;

2) the amount of time the grandparent and the child spend together;

3) the potential detriments and benefits to the child from granting visitation;

4) the effect granting visitation would have on the child's relationship with the parents;

5) the physical and emotional health of all the adults involved, parents and grandparents alike;

6) the stability of the child's living and schooling arrangements;

7) the wishes and preferences of the child; and

8) the motivation of the adults participating in the grandparent visitation proceedings.

*Walker*, 382 S.W.3d at 871.

The Columbias conceded that they believe Kelly is a fit parent. Accordingly, under *Walker*, the family court was required to presume that Kelly's decision to lessen J.T.C.'s time with the Columbias is in J.T.C.'s best interest. There is nothing in the record indicating that the family court failed in this respect. As Kelly notes in her brief, the family court's findings of fact make several references to Kelly's objections to grandparent visitation. The order discusses Kelly's concerns that J.T.C. refuses to do his chores and is stand-offish when he returns home from the Columbias. It acknowledges Kelly's wish that J.T.C. spend more time with her fiancé and their family, and that, if allowed, Kelly would completely excise the Columbias from J.T.C.'s life. Further, the order notes the presumption that Kelly is acting in J.T.C.'s best interest and recites that the petitioning grandparents must present clear and convincing evidence that the parent is mistaken to rebut this presumption. There is nothing indicating that the court failed to afford Kelly's objections the weight they are due.

As to Kelly's contention that the family court's decision "flies in the face of evidence," we must disagree. The family court's order contains detailed and extensive findings of fact. In addition to noting Kelly's objections to the Columbias' involvement in her son's life, it also discusses the enormous benefits J.T.C. has received from spending time with his grandparents. The order notes that the Columbias have been the primary daycare providers for J.T.C. for most of his life, making it so that he had almost daily contact with them and has spent equal time with the Columbias as he has his mother. Kelly has acknowledged that J.T.C.'s time with the Columbias has resulted in him having a strong bond with Paul, much stronger than the average grandfather-grandson relationship. Not only have the Columbias provided J.T.C. with their time and affection, the evidence showed that they have given both J.T.C. and Kelly significant financial support—paying for J.T.C.'s medical treatment and his extracurricular activities, helping Kelly with her rent, and paying the tuition for J.T.C.'s school.

The court's order notes the negative effects J.T.C. experienced when his time with the Columbias was restricted. J.T.C.'s fourth-grade teacher testified that when she first met J.T.C., he was upbeat and a model student. However, when J.T.C. was no longer spending time with the Columbias, his teacher noticed that he was not completing his homework, would sleep in class, and complain frequently of headaches. J.T.C. began performing below his standards in school and, much to his teacher's surprise, did not qualify for advanced placement classes that year. J.T.C. testified that these changes were due to his trouble adjusting to his reduced time with

Paul, who would frequently help J.T.C. study and do his homework.

Additionally, the order discusses J.T.C.'s wishes and evidence indicating Kelly's motivations for restricting visitation. When the court met with J.T.C., he testified to his desire to spend more time with the Columbias and for things to go back to the way they were. As noted above, the order indicated that Kelly's stated motivation for depriving the Columbias of visitation was J.T.C.'s poor behavior upon returning home from the Columbias' house and her desire for more family time. However, the court also noted that Kelly's decision to restrict the Columbias' time with J.T.C. occurred shortly after Paul's mother refused to lend her money.

It is only after an extensive discussion of the evidence and the *Walker* factors that the court concludes that, "[c]onsidering the evidence presented and the holdings of *Walker* ... [Kelly] is clearly mistaken in her belief that grandparent visitation is not in [J.T.C.'s] best interest, and the [Columbias] have proven, by clear and convincing evidence, that grandparent visitation is in [J.T.C.'s] best interest." R. at 65. A review of the order does not indicate that the court made this decision arbitrarily.

It is true that the family court did not specifically map out how each of the facts it discussed fit in with each of the *Walker* factors. This is of no consequence where it is clear to us from a review of the entire opinion that the trial court did properly consider the evidence in light of the relevant factors. The trial court's election to use a certain organizational structure or its failure to follow some prescribed formula in writing its opinion does not constitute an abuse of discretion. While the court did not set out an outline for the parties, a reading of the order indicates that the

court did make detailed findings of fact based on the evidence presented and then analyzed those facts under the *Walker* factors. There is no mandate that the family court write out a separate, detailed analysis for each factor so long as it is clear from its discussion that it properly considered those factors in arriving at its ultimate conclusion. *See Walker*, 382 S.W.3d at 871 ("A [family] court *can* look at several factors to determine whether visitation is clearly in the child's best interest.") (Emphasis added).

■ Kelly next argues that the trial court erred in intermingling the roles of the GAL and the friend of the court. Kelly points to the fact that, during his direct examination of J.T.C., the GAL was permitted to ask J.T.C. leading questions and questions that she feels were investigatory in nature. Specifically, she notes that the GAL asked J.T.C. if he had "ever been questioned about mom having trouble with court," a question she contends is "clearly information that [the GAL] gathered from his investigation." She also notes that the court makes reference to the GAL's closing argument in its order, evidencing that the court gave the GAL's statements the same credibility as testimony.

As an initial matter, we must note that Kelly's brief fails to indicate where in the record this issue was preserved for appeal, as required by CR [2] 76.12(4)(c)(v). After a thorough review of the record, it seems that Kelly's omission of the citation to where in the record this issue was preserved for appeal was more than just mere inadvertence. Kelly's counsel made one objection following the GAL's questioning of J.T.C.—counsel objected to the GAL's line of questioning regarding the Snowball Dance, as he believed the questions were

---

**2.** Kentucky Rules of Civil Procedure.

leading in violation of KRE [3] 611. The nature of this objection does not concern the GAL's role in this proceeding, which is the issue raised on appeal. As such, the issue of the GAL's role is unpreserved. As Kelly's counsel has not invoked CR 61.02 to request palpable error review, we are not required to review the issue. *Celina Mut. Ins. Co. v. Harbor Ins. Agency, LLC*, 332 S.W.3d 107, 113 (Ky. App. 2010) ("Significantly, not only did the Appellant fail to make this argument, it also did not properly preserve the error. Based on the mere failure to preserve, we are not required to consider it.").

 Even if we review it out of an abundance of caution, we note that the distinct roles of the GAL and the friend of the court were examined by our Supreme Court in *Morgan v. Getter*, 441 S.W.3d 94 (Ky. 2014). A friend of the court is "a child's representative appointed as an officer of the court to investigate the child's and the parents' situations, to file a report summarizing his or her findings, and to make recommendations as to the outcome of the proceeding." *Id.* at 111. In contrast, a GAL is "a child's representative appointed to participate actively as legal counsel for the child, to make opening and closing statements, to call and to cross-examine witnesses, to make evidentiary objections and other motions, and to further the child's interest in expeditious, non-acrimonious proceedings...." *Id.* Unlike the friend of the court, "[t]he GAL should not file reports, testify, make recommendations, or otherwise put his own or her own credibility at issue." *Id.* at 114.

Kelly's contention that the GAL's question to J.T.C. regarding her felony conviction indicates that the GAL was actually acting as an investigator for the court is entirely without merit. Kelly claims that the only way the GAL would have this information is by investigating on behalf of the court; however, the GAL was in the courtroom for the entirety of the hearing, during which Kelly's felony conviction was discussed several times. Further, while a GAL investigating on *behalf of the court* would violate *Morgan*, there is no rule barring a GAL from speaking with the child or any party as part of his representation of the child. In fact, we believe than it is incumbent that the GAL interview the child, his client, before questioning him in court. Without doing do, it would be virtually impossible for the GAL to zealously represent his client as our ethical rules require him to do.

Kelly also claims that the court adopted the GAL's recommendation into its order without permitting her to cross-examine him. The portion of the order in contention states:

> The child's Guardian ad Litem recommended the Court grant grandparents' visitation rights to Petitioners, and he believed same was clearly in the child's best interests. He recommended the child should have overnights with Petitioners 1 to 2 nights per week and every Saturday night.

R. 62. The recommendation to which the family court refers is the GAL's closing argument. In this argument he discussed the *Walker* factors as applied to the testimony presented that day and argued that it was his belief that J.T.C.'s interests would be best served by allowing the Columbias visitation. While this argument may not have been what Kelly desired, it is clearly distinguishable from the recommendation tendered to the court in *Morgan*, which was largely based on the GAL's interviews with the parties and children and his visit to Morgan's residence, and

---

3. Kentucky Rules of Evidence.

was entirely adverse to Morgan. *Morgan*, 441 S.W.3d at 96. The GAL in *Morgan* clearly performed an independent investigation for the benefit of the court, outside of the normal role of an attorney for one of the parties.

In the present case, the GAL was appointed to represent J.T.C.'s best interests. There is nothing in the record indicating that the GAL had the additional role of investigating matters on behalf of the court. The GAL did not file a recommendation with the court. He did make a closing argument, in which he advocated for what was in J.T.C.'s best interests. He also called and cross-examined witnesses on behalf of J.T.C. Nothing in the record indicates that the GAL was acting outside the confines of *Morgan*. As such, we find nothing about the GAL's role in this proceeding that constitutes error to Kelly.

## IV. Conclusion

For the foregoing reasons, the order of the Clark Family Court is AFFIRMED.

ALL CONCUR.