RENDERED:  DECEMBER 9, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0374-MR

LILLIE NEACE                                                                                 APPELLANT

v.
APPEAL FROM BREATHITT FAMILY COURT
HONORABLE LARRY MILLER, JUDGE
ACTION NO. 20-CI-00116

BERTHA NEACE AND
BYRON NEACE                                                                               APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; CALDWELL AND MAZE, JUDGES.

CLAYTON, CHIEF JUDGE:  Lillie Neace appeals from the Breathitt Family

Court's findings of fact, conclusions of law, and judgment denying her petition for

grandparent visitation.  Having reviewed the record and applicable law, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Lillie Neace (Grandmother) is the paternal grandmother of Byron D. Neace (Child), who was born on February 13, 2008.  His parents are Bertha Renae Neace, now Hollon, (Mother) and Grandmother's late son, Ishmael Duane Neace (Father).

In 2016, Grandmother, a widow, sold her house and contributed the proceeds to help purchase a new home where she resided with Mother, Father, and Child.  The arrangement was amicable.  Grandmother assisted the family financially, served as Child's babysitter, and occasionally took him to school and medical appointments.  Grandmother vacationed with the family and she and Child developed a strong bond.

In 2018, the family decided to move to a different house.  Shortly before the move was to take place, Father died unexpectedly of a congenital illness.  Mother and Grandmother continued with the original plan and moved into the new home, with Child, in December 2018.

Grandmother, Mother, and Child lived together for approximately eighteen months following Father's death.  The relationship between Grandmother and Mother began to deteriorate, in part because Mother began dating Alan Hollon, whom she eventually married in April 2021.  In July 2019, during a yard sale, Grandmother and Mother got into an argument which escalated into a physical

altercation. Grandmother tore the sleeve of Mother's shirt and Mother grabbed her arms and pushed her away. Child witnessed the fight. In his interview with the family court, he stated that he was scared because Grandmother hit Mother on the shoulder.

In April 2020, Mother and Child returned home late after spending the day ATV driving with Hollon. They found Grandmother sitting with a handgun lying on the dining table. According to Grandmother, the gun was for her protection because she was home alone, and Mother and Child came in before she could put it away. Grandmother was angry that they were spending time with Hollon. She reminded Child she had bought him his four wheeler and told him he was never to have it on Hollon's trailer again. She threatened to fill Hollon full of lead if he stepped on her property. Child was extremely upset and wanted to leave, so he and Mother left that night to stay with Mother's parents. Mother arranged to have the title of the house changed to Grandmother's name and transferred the home loan to Grandmother.

Mother returned to the house on three occasions to retrieve her belongings. She was accompanied by Deputy Sheriff Mike Wolfe, who described cursing and name calling, mainly between Grandmother and Hollon. He described Mother as remaining fairly calm and just wanting to get her things out of the house. Child was not present on these occasions.

Grandmother repeatedly tried to keep in touch with Child after he and Mother moved out. Child vehemently refused to see Grandmother and Mother refused to force him to see her. Mother reported that when they drove by Grandmother's house, Child would lie on the floorboards of the car to avoid Grandmother catching sight of him. Grandmother attended Child's ball games and tried to speak with him there, but he hid in the locker room to avoid her. Mother tried unsuccessfully to get an emergency protective order to prevent Grandmother from coming to the games because her presence was causing Child so much anxiety. Grandmother tried repeatedly to phone Child, at times very late at night, and sent him numerous texts. He refused to respond.

On July 9, 2020, Grandmother filed a petition for grandparent visitation. On Mother's motion, the family court appointed a guardian *ad litem* (GAL) for Child. Upon the recommendation of the GAL, Grandmother sent Child a letter, but he refused to read it. The parties participated in mediation in November 2020 at which they agreed that Child would receive counseling from his school guidance counselor. Due to the constraints imposed by the COVID-19 pandemic and virtual schooling, Child's first session with the counselor did not take place until January 2021. Grandmother filed two motions requesting the family court to order grief counseling for Child by a qualified mental health professional. Mother responded that this was Child's decision and the only

counseling to which he would agree was from his school guidance counselor. The trial court ruled that if the school counselor believed additional counseling by a qualified mental health professional would be beneficial to Child, the parties should agree to another counselor, and make arrangements for such counseling. The school counselor did not make such a recommendation, however, opining that Child did not require grief counseling for the death of his father. Following a hearing, the family court denied Grandmother's motion to make Child undergo grief counseling.

A final hearing on the petition for grandparent visitation was held on December 10, 2021. Grandmother testified that Father was her only child and Child was her only grandchild. She initially got along well with Mother and her earlier relationship with Child was very close. This was corroborated by the testimony of a cousin of the family, Linda Neace, a social worker, who described the relationship between Grandmother and Child as wonderful. Grandmother claimed she did not know why Mother and Child moved out in 2020 and denied that there had been a disagreement. She suggested that Mother did not appreciate Grandmother telling her to give Child more time after she started dating Alan Hollon and testified that Mother told her that grandparents do not have rights. She testified that she was willing to meet Child in any setting, but he refused.

Grandmother stated that she wanted to find out if there was manipulation behind why he would not see her.

Mother testified that she repeatedly encouraged Child to meet Grandmother, but he refused because he is fearful of her. She described how he falls to the floorboards of the car when he sees her and will not come out of the locker room if she attends his ball games. She assured the court that "the day he says he wants to see her, I'll take him." Mother testified that since the break with Grandmother, Child was doing very well at school, is peaceful, does not argue, has gained weight, is more outgoing, and has lots of friends. She reported that Child feared the court would not listen to him and he would be forced to see Grandmother and relive past conflicts. He did not want to go to a grief counselor. Mother acknowledged that when they lived together, she used Grandmother as a babysitter and that they had a happy relationship while Father was alive. She was adamant that she was not going to force him to see Grandmother.

Child was thirteen years of age and attending the seventh grade at the time of his interview with the trial court. He was very upset and crying throughout the interview. He reported that he witnessed Grandmother hitting his mother and that he was scared. He also described the incident when they returned home and saw Grandmother with the gun on the dining table, and he told the court he thought the gun was there to hurt his mother. Child admitted that Grandmother had never

hit or pushed him. He told the court Grandmother tried calling him at one or two o'clock in the morning which also scared him. He steadfastly stated he did not want to see Grandmother, in person or via phone call or videoconference. The family court explained that his Grandmother loved him very much and that she came to court to tell her side of the story, as it was her only way to see him. Child explained that he needed more time, possibly a year or two, before he could see her again. He told the court he wished Grandmother would quit the things she is doing, such as instigating the court proceedings.

The family court concluded that it would be emotionally damaging and not in his best interest to force Child to have contact with Grandmother and, based on his answers and his distraught demeanor, the court agreed with Child that he needed more time.

The court entered extensive findings of fact, conclusions of law, and judgment denying the petition for grandparent visitation. It did not find by clear and convincing evidence that visitation would be in Child's best interest at that time but also stated that there was nothing in the judgment to prevent Child from contacting Grandmother if he wished to do so. This appeal by Grandmother followed.

# STANDARD OF REVIEW

KRS 405.021(1)(a) provides that the "Circuit Court may grant reasonable visitation rights to either the paternal or maternal grandparents of a child . . . if it determines that it is in the best interest of the child to do so." In *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), the United States Supreme Court recognized that parents' fundamental right to raise their children means "there is a presumption that fit parents act in the best interests of their children[,]" and that "if a fit parent's decision . . . becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination." *Id.* at 70, 120 S. Ct. at 2062. Because of this constitutional presumption, the Kentucky Supreme Court has held that a grandparent must show that visitation is in the child's best interest by the heightened clear and convincing standard. "In other words, the grandparent must show that the fit parent is clearly mistaken in the belief that grandparent visitation is not in the child's best interest. If the grandparent fails to present such evidence to the court, then parental opposition alone is sufficient to deny the grandparent visitation." *Walker v. Blair*, 382 S.W.3d 862, 871 (Ky. 2012).

In determining whether visitation is in the child's best interest, the trial court can consider several factors:

> 1) the nature and stability of the relationship between the child and the grandparent seeking visitation;

2) the amount of time the grandparent and child spent together;

3) the potential detriments and benefits to the child from granting visitation;

4) the effect granting visitation would have on the child's relationship with the parents;

5) the physical and emotional health of all the adults involved, parents and grandparents alike;

6) the stability of the child's living and schooling arrangements; . . .

7) the wishes and preferences of the child[;]

 . . . [and]

8) the motivation of the adults participating in the grandparent visitation proceedings.

*Id*.

"We review the trial court's findings of fact applying the clearly erroneous standard, under which we give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Id*. at 867 (internal quotation marks and citations omitted). "But the interpretation of KRS 405.021(1) in accordance with federal constitutional law and the application of the appropriate standard to the facts are issues of law that we review de novo." *Id*.

# ANALYSIS

## I.  The Standard of Proof

Grandmother argues that the clear and convincing standard of proof mandated in *Walker v. Blair*, *supra*, does not apply in this case because Mother did not oppose visitation.  Mother testified that she would not oppose Child visiting Grandmother if he consented to do so, but that she would not compel him.  On that basis, Grandmother argues she should not have been required to show by clear and convincing evidence that grandparent visitation was in Child's best interest.  But Mother was opposing visitation, not from her own personal motivation, but because she believes it is in Child's best interest.  Consequently, under *Walker*, the assumption that as a fit parent she was acting in his best interest does apply and so does the clear and convincing standard of proof.

## II.  Grief Counseling

Next, Grandmother argues that the family court erred by prioritizing Child's wishes over the emotional health of the parties by not ordering Child to receive grief counseling from a qualified mental health professional.  She contends that Child's highly emotional and tearful responses during his interview should not have been used by the family court as the basis for denying visitation but should instead have warranted evaluation by a mental health provider.  She criticizes the trial court's delegation of this responsibility to a guidance counselor whose

effectiveness she questions on the grounds that the counselor serves several hundred children and met with Child on only two occasions.

But there was substantial evidence before the court that Child did not require grief counseling. Mother testified that his mental and physical health improved dramatically after stopping contact with Grandmother. He was excelling at school, he had many friends, was less anxious, and was gaining needed weight. There was little evidence that his resistance to visiting with Grandmother was related to grief stemming from the death of his father, which occurred over a year before he and Mother moved out. Child's own candid statements to the court revealed that he fears Grandmother as a threat to his Mother and sees her as a disruptive influence in his life. His fear is based on Grandmother's physical altercation with Mother and Grandmother's threat of violence against Alan Hollon, who is now Child's stepfather and with whom he has a good relationship.

Grandmother relies on an unpublished opinion of this Court, *J.M. v. L.H.*, No. 2014-CA-001608-ME, 2015 WL 2330454 (Ky. App. May 15, 2015), which affirmed an award of grandparent visitation and ordered all the parties to attend a parental education clinic. The Court in that case found considerable animosity between the parents and grandmother and manipulation and potential mental health issues on both sides. The Court concluded, however, that the grandmother's desire for a loving relationship with the child and the child's clear

-11-

love for the grandmother and desire to visit with her outweighed the other negative factors. *Id*. at *2.

The case before us is clearly distinguishable, however, because Child is vehemently opposed to visitation with Grandmother and evidence was elicited that he suffers from anxiety and stress when he encounters her. "Counseling is one of many tools a family court has in effecting its purpose of 'strengthen[ing] and preserv[ing] the integrity of the family and safeguard[ing] marital and familial relationships.' KRS 23A.110(1). Whether to order counseling in a given case is a matter within the family court's sound discretion." *N.B. v. C.H.*, 351 S.W.3d 214, 220 (Ky. App. 2011). In *N.B.*, this Court affirmed the family court's refusal to compel a child to continue participating in reconciliation counseling with her mother. The child "stringently expressed resistance to additional counseling and other reconciliation efforts[,]" and the family therapist expressed concern that pushing her "into a reconciliation attempt might be counterproductive." *Id*. at 220. A similar analysis is applicable in this case. Child was opposed to further counseling and the school guidance counselor opined that he was not anxious, depressed, or in trouble and that compelling him to attend grief or mental health counseling was not necessary. The trial court's decision not to order grief counseling was well within its sound discretion.

### III. Child's Wishes

Finally, Grandmother argues that all the factors outlined in *Walker* support visitation, except for the wishes of Child, and that the trial court abused its discretion in basing its ruling solely on this factor. She contends that the fact she had a longstanding bond with Child, had provided financial support for him, and cared for him for many years, should outweigh the wishes of a minor child. She reiterates that Child's wishes were based on emotion and his difficulty dealing with the death of Father, which she claims is evidenced by the emotional interview with the family court.

There is no authority stating that the court must base its decision on all the best interest factors or that they need all be given equal weight. Nor is a court barred from giving greater weight to one of the factors above all the others.

Grandmother argues that *Nein v. Columbia*, 517 S.W.3d 492 (Ky. App. 2017) in which an award of grandparent visitation was upheld, compels a similar result in her case. In *Nein*, the grandparents had served as the primary babysitters/caregivers for the child since he was an infant. His mother began limiting their contact when he was about nine years of age, alleging that he misbehaved when he returned home from his grandparents' house. The Court noted, however, that the decision to restrict visitation occurred shortly after the great-grandmother refused to lend the mother money. The opinion emphasized,

reiterating the *Walker* standard, that "while the petitioning grandparent need not show that denying visitation will harm the child, they must 'show that the fit parent is clearly mistaken in the belief that grandparent visitation is not in the child's best interest.' If the grandparent is unable to make this showing, 'then parental opposition alone is sufficient to deny the grandparent visitation.'" *Id.* at 496 (citation omitted). In *Nein*, unlike the case before us, the child informed the court that he wanted to spend more time with his grandparents and for things to go back to the way they were. *Id.* at 498. Based on the record before us, Grandmother simply failed to provide clear and convincing evidence that Mother was mistaken in believing that visitation was not in Child's best interest. Child is an articulate and intelligent teenager who clearly expressed his wishes, and the basis of his opposition to visitation, to the family court. Mother testified that Child was physically and emotionally healthier and happier not having contact with Grandmother for the time being. The family court applied the appropriate standard in giving decisive weight to Mother's decision to respect Child's wishes, based on her own observation and insight.

## CONCLUSION

For the foregoing reasons, we affirm the findings of fact, conclusions of law, and judgment of the Breathitt Family Court.

ALL CONCUR.

BRIEF FOR APPELLANT:

Melissa C. Howard
Tammy E. Howard
Jackson, Kentucky

BRIEF FOR APPELLEE:

Christina Edmonds-Noble
Jackson, Kentucky