PER CURIAM.
On June 21, 2016, K.H. filed in the Jefferson Juvenile Court ("the juvenile court") a petition seeking to have a child born to M.M. ("the mother") declared dependent and seeking an award of custody of the child. The mother filed an answer asserting, among other things, that K.H. had intervened in a divorce action between the mother and B.M., the mother's husband, that was then pending in the Jefferson Circuit Court ("the circuit court"). The mother alleged that in a June 20, 2016, order, the circuit court had ordered that the child be "returned" to the mother. It is undisputed that the circuit court in the mother's divorce action did not receive any evidence before it entered the order "returning" custody of the child to the mother. It does not appear that K.H. sought appellate review of that order.
We note that it appears the mother had physical custody of the child pursuant to the circuit court's order for approximately one to two days when K.H. filed the dependency petition. The mother bases her argument-that there was no evidence indicating that she was not properly caring for the child at the time the dependency petition was filed-on that custodial period. It appears that the juvenile court awarded K.H. pendente lite custody of the child. The juvenile court awarded the mother visitation during the pendency of the dependency action, and that visitation took place with no difficulties.
The juvenile court conducted an ore tenus hearing in the dependency action. On October 15, 2016, the juvenile court entered a judgment in which it found the child dependent and awarded custody of the child to K.H., subject to the mother's rights of visitation. The mother filed a postjudgment motion on October 28, 2016. The juvenile court rendered an order extending its time to consider that postjudgment motion so that it could conduct a hearing on the motion on November 17, 2016. See Rule 1(B)(1), Ala. R. Juv. P. (providing that a juvenile court may extend the time for considering a postjudgment motion for an additional 14 days by issuing a written order to that effect). The juvenile court entered an order on November 17, 2016, in which it denied the postjudgment motion in substance but made minor alterations to the original judgment. The mother timely appealed.
The record indicates the following facts. The mother was married to B.M., and the two had a child, D.M. ("the half sibling"), born in 2014. The mother and B.M. separated in May 2015; a divorce action between the two was initiated in the circuit court at some point in 2015. The mother testified that she began a relationship with another man and that, in July 2015, she became pregnant with that man's child, who is the child at issue in this case. For *294 the first time at the dependency hearing, the mother identified J.A. as the man with whom she had had the relationship in 2015 and as the father of the child. The mother testified that J.A. had asked her to have an abortion and that their relationship had ended.
The mother's divorce action was stayed during her pregnancy, and it is undisputed that B.M. was excluded, through genetic testing, as being the father of the child. At the time of the dependency hearing in this matter, a judgment had been entered in the mother's divorce action that divorced the parties to that action and awarded them joint legal and joint physical custody of the half sibling. The mother explained that she and B.M. alternate custody of D.M. on a weekly basis.
The mother testified that K.H. was her hairdresser and that she had learned that K.H. and her husband, J.H., were unable to have children. The mother approached K.H. about the possibility of K.H. and J.H. adopting the child. K.H. and J.H. agreed; the record indicates that the mother spoke primarily with K.H. and that she spoke with J.H. only once before the child was born. K.H. attended several prenatal doctor's appointments with the mother.
The child was born, two months premature, on February 4, 2016. The next day, on February 5, 2016, the mother signed a form at the hospital in which the child was born that identified K.H. and J.H. as the "adoptive parents" and allowed them access to the child in the hospital. The mother also signed a form that allowed the hospital to release the child, upon her discharge, into the custody of K.H. and J.H. The mother acknowledged during the dependency hearing that, by signing those forms, she believed that she was relinquishing custody of the child to K.H. and J.H.
The mother was discharged from the hospital within a few days of the child's birth, but the child was not discharged into the care of K.H. and J.H. until March 7, 2016. The patient-care instructions for the child upon her discharge were signed by K.H. on March 7, 2016, as the "parent/guardian." The record indicates that the mother visited the child in the hospital weekly until the child was discharged.
On March 16, 2016, J.H. was arrested in connection with his alleged abuse of prescription medications. K.H. immediately moved out of the home she had shared with J.H. and moved, with the child, into her parents' home. K.H. explained that she did not want to have herself or the child in an environment in which drugs might be an issue. She admitted that J.H. had a previous arrest, apparently related to drug use, but that the charges stemming from that arrest had been dropped; the record does not indicate when that occurred or if it occurred during her marriage to J.H.
K.H. informed the mother of J.H.'s arrest and the fact that the two had separated on March 17, 2017. Both K.H. and the mother testified that the mother told K.H. that she needed to think. The mother testified that she asked for the return of the child the next day. K.H. disputed that testimony and stated that the mother telephoned her back quickly and told her that she would not take any action to prevent K.H. from adopting the child.
The mother testified that she visited the child at the mother's parents' home or K.H.'s parents' home once a week for five or six weeks after K.H. left J.H. K.H. testified she had accommodated all of the mother's requests for visitation with the child until the Wednesday before Mother's Day weekend, when the mother requested that she be allowed to take the child to a "meet and greet" on the Saturday of Mother's Day weekend. K.H. stated that she *295 refused that request by the mother to pick up the child and take her to meet the mother's family. On May 9, 2016, the day after Mother's Day, the mother filed in her divorce action a motion for the return of custody of the child from K.H. We note that the mother testified that she had asked for the child for a "meet and greet" with her family in late March or April 2016, although she was uncertain of the specific date on which she made that request.
The mother testified that she had not been allowed to see the child for a period of approximately six to seven weeks between the time she filed her May 9, 2016, motion for the return of the child in her divorce action through the date of the June 20, 2016, hearing on that motion. K.H. testified that the mother had not asked to visit the child during that period and that, with the exception of the mother's request to take the child for the "meet and greet" with her family, she had not refused any of the mother's requests to see the child.
The juvenile court questioned the mother about several issues. In response to that questioning, the mother explained that she wanted the child to be raised in a two-parent, Christian home and that K.H. could not provide that because she was in the process of obtaining a divorce. The juvenile court asked the mother whether she would have sought the return of the child if J.H. had died instead of engaging in conduct that led to the divorce action between him and K.H., and the mother responded in the negative. The mother agreed with the juvenile court that if custody of the child were returned to her, the child would not be raised in a two-parent home. However, the mother testified that if the child were returned to her, she would have the child only temporarily. The mother explained that life-long family friends ("the family friends") wanted to adopt the child and that she intended to allow them to do so. The mother stated that she and the family friends shared a close relationship and that the families had vacationed together. The mother explained that she had not approached the family friends about adopting the child because she had not known they were looking to adopt. In response to questioning from the juvenile court about why she had approached K.H., rather than the family friends, about adopting the child, the mother claimed that it had not occurred to her to inquire why the family friends were childless after nine years of marriage.
As a part of this action, the juvenile court ordered the Jefferson County Department of Human Resources ("DHR") to perform home evaluations for K.H. and for the mother. Carla McIntyre, the DHR social worker, testified that she had no concerns about the home K.H. and the child shared with K.H.'s parents at that time. McIntyre stated that she was "impressed" because K.H. had a nursery for the child, food for her, and the house was "baby-proofed." McIntyre testified that when she spoke with the mother on June 15, 2016, about scheduling a safety walk-through of the mother's home to ensure that the home was safe for the child and that the mother had necessary items for the child, the mother informed her that she did not have any items necessary to care for the child. McIntyre testified that she told the mother that those things were necessary before the child could be released to go home with the mother. McIntyre stated that the mother contacted her on June 20, 2016, to schedule the safety walk-through and that, by that time, the mother had purchased a bassinet, a pack of diapers, baby wipes, and "a little amount of food" for the child. McIntyre reported that she did not find any areas of concern in the mother's home.
*296 At the close of her presentation of evidence, K.H. moved for a judgment as a matter of law. After oral argument, the juvenile court granted that motion. In its October 15, 2016, judgment, and in its postjudgment order, the juvenile court found the child to be dependent as a result of the mother's abandonment of the child.
The mother first argues that the juvenile court lacked jurisdiction over the dependency action. However, K.H. initiated a separate dependency action during the pendency of the mother's divorce action. Under § 12-15-114(a), Ala. Code 1975, a juvenile court exercises exclusive jurisdiction over an action alleging that a child is dependent. The initiation of a dependency action is an exception to the rule that a circuit court retains jurisdiction over the issue of custody of a child in a divorce action. M.P. v. C.P., 8 So.3d 316, 318 (Ala. Civ. App. 2008). "Although a circuit court ordinarily retains continuing jurisdiction over the custody of a child, in the event a genuine dispute between a parent and a third party arises as to the dependency of the child, the juvenile court assumes exclusive jurisdiction to adjudicate that dispute." P.S.R. v. C.L.P., 67 So.3d 917, 922 (Ala. Civ. App. 2011). "[A] circuit court does not retain exclusive jurisdiction over a child whose custody is addressed in a divorce judgment when a separate action is initiated in a juvenile court alleging that the child is dependent." B.H. v. Tuscaloosa Cty. Dep't of Human Res., 161 So.3d 1215, 1218 (Ala. Civ. App. 2014). Once the juvenile court's jurisdiction is triggered by allegations that, if proven, are sufficient to find a child dependent, the juvenile court loses jurisdiction if it determines, after a hearing, that the child is not dependent. A.G. v. Ka.G., 114 So.3d 24, 26-27 (Ala. 2012). However, the juvenile court maintains jurisdiction if the child is found to be dependent. Thompson v. Halliwell, 668 So.2d 43, 44 (Ala. Civ. App. 1995).
In this case, K.H. alleged that the mother had abandoned the child, and she sought emergency relief and a determination that the child was dependent. That petition was sufficient to invoke the jurisdiction of the juvenile court pursuant to § 12-15-114(a). The juvenile court later conducted an ore tenus hearing, and, based on the evidence it received at that hearing, it found the child to be dependent. Once a juvenile court makes a dependency determination, it retains jurisdiction to enter a custodial disposition of the child. § 12-15-311(a), Ala. Code 1975; Thompson v. Halliwell, supra. Thus, after finding the child in this case to be dependent, the juvenile court had jurisdiction to enter a custody determination.
The mother also argues that the juvenile court erred in finding the child to be dependent. We note that, as a part of her argument on this issue, the mother also contends that the evidence does not support a determination that she was unfit to parent the child. There is no requirement that a court find a parent unfit in determining a child to be dependent. P.D. v. S.S., 67 So.3d 128, 131-32 (Ala. Civ. App. 2011). In this case, the juvenile court made no finding that the mother was unfit. Rather, the juvenile court found that the mother had abandoned the child.
Under the Alabama Juvenile Justice Act ("the AJJA"), §§ 12-15-101 et seq., Ala. Code 1975, a dependent child is defined, in pertinent part, as follows:
"(8) Dependent Child. a. A child who has been adjudicated dependent by a juvenile court and is in need of care or supervision and meets any of the following circumstances:
"....
*297 "2. Who is without a parent, legal guardian, or legal custodian willing and able to provide for the care, support, or education of the child.
"....
"5. Whose parent, legal guardian, legal custodian, or other custodian has abandoned the child, as defined in subdivision (1) of Section 12-15-301.
"6. Whose parent, legal guardian, legal custodian, or other custodian is unable or unwilling to discharge his or her responsibilities to and for the child.
"....
"8. Who, for any other cause, is in need of the care and protection of the state."
§ 12-15-102(8), Ala. Code 1975.
The mother argues on appeal that she did not "voluntarily relinquish" custody of the child, in accordance with the provisions of § 26-10A-11(a), Ala. Code 1975, a portion of the Alabama Adoption Code, § 26-10A-1 et seq., Ala. Code 1975, which requires a signed, written relinquishment containing a list of certain requirements. In making her argument on this issue, the mother contends only that the documents she signed in the hospital were not sufficient to constitute "adoption forms." We note, however, that the juvenile court did not apply the Adoption Code, or conclude that the mother had voluntarily relinquished custody pursuant to § 26-10A-11 or that the forms she signed at the hospital on February 5, 2016, authorizing K.H. and J.H. to have access to the child and that the child be released from the hospital into their custody constituted adoption forms.
It does appear that the juvenile court, in its postjudgment order, intermingled its determination of dependency with a discussion indicating that it had concluded that the mother, by executing the forms in the hospital, had executed documents sufficient to conclude that she had voluntarily transferred legal custody of the child to K.H. and J.H. We do not reach the issue whether such a transfer of legal custody could be effected, however, because there is no argument on that issue in the parties' briefs. Rather, we interpret the juvenile court's October 15, 2016, dependency judgment and the November 17, 2016, postjudgment order as citing to the mother's execution of the hospital forms as evidence of the mother's intention to transfer custody of the child to K.H. and J.H., to leave the child in their care, and to allow them to fulfill parental responsibilities for the child.
The juvenile court cited the mother's execution of those forms, and her allowing the child to be cared for and reared by others since the child's birth, as evidence of her abandonment of the child. Under the AJJA, the term "abandonment," for the purposes of § 12-15-102(8), Ala. Code 1975, is defined as:
"A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
§ 12-15-301(1), Ala. Code 1975. Thus, although while the mother's execution of the hospital forms would not constitute a voluntary relinquishment under the § 26-10A-11 of the Adoption Code, we cannot say that she has demonstrated that the juvenile court erred in considering her execution of those forms in reaching its determination that she intentionally and voluntarily transferred or relinquished custody of the child to K.H. and J.H. for *298 the purposes of § 12-15-301 and § 12-15-102(8). The mother has not argued that the juvenile court could not consider her execution of the hospital forms as a basis for determining that she had abandoned the child as that term is defined in § 12-15-301, and this court may not formulate such an argument on her behalf.
The mother argues that this case is similar to T.E.W. v. T.S., 97 So.3d 157 (Ala. Civ. App. 2012). She points out that, in that case, this court noted that, although there were times in which the father in that case failed to "actively assert his rights as a father," there was no evidence indicating that he had abandoned the child. 97 So.3d at 162. In that case, the father had been adjudicated the father of the child and had regularly exercised visitation, albeit at the discretion of the mother. After the mother became ill, she attempted to transfer custody of the child to the child's aunt. The aunt filed a dependency petition, to which the father objected. The juvenile court determined that the child was dependent and awarded custody to the aunt, but this court reversed, stating, in part:
"[T]he evidence indicates that the father has been regularly involved in the child's life and that he has consistently provided for her support. The father became more involved in caring for the child in response to the mother's health crisis in the year before the mother's death.... The record contains no evidence indicating that the father is not ready and willing to appropriately parent and care for the child."
T.E.W. v. T.S., 97 So.3d at 163 (emphasis added).
In this case, the mother approached K.H. about an open adoption of the child. The mother signed documents identifying K.H. and J.H. as the adoptive parents and permitting the hospital to allow them to visit and care for the child in the hospital for the six weeks following the child's birth and to release the child into their care when the child was finally released from the hospital. The mother relies on the fact that she visited the child almost weekly until May 2016 as evidence that she did not abandon the child. We note that regular visits were a part of the open-adoption agreement she reached with K.H. However, there is no indication that the mother played any role in providing care for the child.
The mother also contends that the evidence does not indicate that she failed to provide for the child. She states that she has continued to provide health insurance for the child since the child's birth. The mother does not contend that she provided any other form of financial support for the child.
The mother also insists that there is no evidence indicating that she could not properly parent the child. However, the mother's ability to parent the child was not at issue during the dependency hearing. Rather, the issue at the dependency hearing was whether the mother was willing to parent the child and had instead left all parenting responsibilities for the child to K.H. Even at the time of the dependency hearing, the mother was not willing to assume the duties of providing for and caring for the child. Rather, the mother admitted that if the juvenile court awarded her custody of the child, the child would be with her only temporarily while she arranged for a different family to adopt the child. Thus, unlike in T.E.W. v. T.S., supra, there is no evidence in this case tending to indicate that the mother is"ready and willing to appropriately parent and care for the child." 97 So.3d at 163.
This action did not proceed as an adoption action to which the mother might revoke her consent to an adoption. The *299 mother contends that she did not intend to transfer custody of the child to K.H. and J.H. and that she did not fail to claim the rights of, or perform the duties of, a parent. However, the juvenile court interpreted the mother's conduct following the child's February 4, 2016, birth, as an abandonment of the child. The juvenile court was in the best position to observe the mother as she testified and to assess her demeanor. See J.S.M. v. P.J., 902 So.2d 89, 96 (Ala. Civ. App. 2004). Given the evidence in the record, as well as the findings of the juvenile court, we cannot say that the mother has demonstrated that the juvenile court erred in reaching its dependency determination and in making the custody award to K.H.
We note that, in her brief on appeal, the mother also asserts a due-process argument concerning the fundamental right of a parent to make decisions concerning their children. We do not reach that issue, because that argument was not presented to the juvenile court. " 'It has long been the law in this state that constitutional questions not raised in the court below will not be considered for the first time on appeal.' " S.J. v. Limestone Cty. Dep't of Human Res., 61 So.3d 303, 306 (Ala. Civ. App. 2010) (quoting Smith v. State Dep't of Pensions & Sec., 340 So.2d 34, 37 (Ala. Civ. App. 1976) ). The judgment of the juvenile court is affirmed.
AFFIRMED.
Pittman, Thomas, Moore, and Donaldson, JJ., concur.
Thompson, P.J., dissents, with writing.
In this case, it is undisputed that M.M.("the mother") intended to allow K.H. and J.H. to adopt the child. The hospital forms signed by the mother had no legal effect with regard to the custody of the child; rather, they relieved the hospital of liability for releasing the child into the care of K.H. and J.H. The hospital forms, while not conclusive or sufficient in themselves to transfer custody to K.H. and J.H., indicate the mother's intention to allow them to adopt the child. However, soon after the child left the hospital in the care of K.H. and J.H., the two decided to divorce. After she learned of the impending divorce between K.H. and J.H., the mother continued to visit the child regularly, and she soon sought a return of custody of the child. The Jefferson Circuit Court, which was presiding over the mother's divorce action, awarded the mother custody of the child, and, the next day, K.H. initiated this dependency action.
The record indicates that, although the mother's conduct was far from ideal, she maintained contact with the child and provided limited support in the form of providing health insurance for the child. It is undisputed that the mother wanted the child to be adopted into a two-parent, Christian home, and I conclude that it was her right to select the home in which her child is to be reared. This action involves a close question, and it has been difficult for this court to resolve. However, parents have a fundamental right "to make decisions concerning the care, custody, and control of their children." Troxel v. Granville, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Given the evidence, and considering the fundamental rights of the mother to the child, I cannot agree with the juvenile court that the evidence supports a determination that the mother abandoned the child, as that term is defined in § 12-15-301, Ala. Code 1975, so as to cause the child to be dependent under the AJJA and § 12-15-102(8), Ala. Code 1975. Accordingly, I would reverse the juvenile *300 court's judgment. For that reason, I respectfully dissent.