# IN THE COURT OF APPEALS OF IOWA

No. 24-1875
Filed October 15, 2025

**IN RE THE GUARDIANSHIP OF K.W., a Minor.**

**S.W.,**
　　　　Appellant.
_____

Appeal from the Iowa District Court for Warren County, Kevin Parker, Judge.

A petitioner appeals the juvenile court's refusal to create a guardianship under Iowa Code chapter 232D (2024). **AFFIRMED.**

Jonathon P. Tarpey of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellant.

Randall L. Jackson, Ryan Ellis, and McKenzie Ellis of Ellis Law Offices, P.C., Indianola, for appellee.

Considered without oral argument by Tabor, C.J., and Ahlers and Langholz, JJ.

**TABOR, Chief Judge.**

Fourteen-year-old K.W. lost his father, L.W., in a tragic motorcycle accident. After L.W.'s death, his fiancé, S.W., petitioned for guardianship of K.W.—without consent of his mother, J.A. The juvenile court denied the guardianship under Iowa Code section 232D.204(2) (2024). Because S.W. did not offer clear and convincing evidence that J.A. was unwilling or unable to meet her son's physical and emotional needs, we affirm.

## I. Facts and Prior Proceedings

K.W.'s parents, L.W. and J.A., divorced in 2012. For most of his life, K.W. lived with his mother in Saint Joseph, Missouri.[1] In 2015 and 2019, the Missouri court entered orders providing visitation to his father. In August 2024, the parties agreed that K.W. would move to L.W.'s home in Lacona, Iowa.[2] The agreement—memorialized in a judgment of modification—designated the parents as joint legal custodians and provided liberal visitation to J.A. The judgment also stated that J.A. would continue to manage K.W.'s medical appointments.

Just one month after K.W.'s move to Iowa, L.W. and S.W. were in a devastating motorcycle collision with a car. L.W. died in the hospital. And S.W. suffered numerous fractures, leading to many surgeries and requiring rehabilitation.

After the accident, family members met with K.W. to decide where he would live. They agreed J.A. would bring K.W. back to Missouri, but K.W. would return

---

[1] K.W. has two half-siblings who live with his mother.
[2] Also living in that home were L.W.'s long-time fiancé, S.W., and K.W.'s half-sibling, who was eight years old.

to Iowa for his high school's homecoming parade on the weekend of September 27, 2024.

Meanwhile, on September 25, S.W. filed a petition for guardianship of K.W. The court appointed S.W. as emergency temporary guardian on September 30. The court also appointed a court visitor under Iowa Code section 232D.305. Given these developments, after K.W. returned to Iowa for homecoming, he continued to stay in his father's home for two more months. Because S.W. remained in the hospital, her sister and mother helped provide care for K.W.

The juvenile court set a hearing on S.W.'s guardianship petition for late October 2024. At the time of the hearing, S.W. was still in the hospital recovering, soon to attend rehabilitation after surgery. From the hospital, S.W. testified that she was seeking a guardianship over K.W. "to keep him safe and keep him in the school that he enjoys, and he enjoys being up here with us, and he's my son." When asked what she would be keeping him safe from, she responded, "from his mother [J.A.]" S.W. then listed three reasons why she did not believe that K.W. was safe in his mother's custody.

First, S.W. recounted the sexual abuse that K.W. endured from his stepfather, B.A., when the child was eight years old. K.W. disclosed the abuse to his mother, J.A., when he was eleven.[3] Second, S.W. alleged that J.A. engaged in "emotional abuse" of K.W. In his testimony, K.W. recalled that his mother would often "get mad" and yell at him. Third, S.W. asserted that J.A. had physically

---

[3] The record shows that upon learning of the sexual abuse, J.A. took steps to protect K.W. She contacted police, obtained a protective order, and divorced B.A. B.A. went to prison. After that, J.A. arranged for K.W. to attend therapy, and the mother and son did family counseling.

abused K.W. by pushing him, leaving a handprint on his chest. She testified that incident occurred just before L.W. sought the custody modification order.

By contrast, J.A. testified she agreed to the modification because K.W. wanted to have a stronger relationship with his father.[4] J.A. also described K.W.'s allegation of physical abuse as an "exaggeration." She testified, "I pushed him off me, but there was no physical bruise or handprint." More generally, J.A. resisted the guardianship petition. She testified, "I am his mother and I want him to come home and start his healing process and get in therapy and start a normal routine with people that he has had support for the last fourteen years." She said K.W. had "an enormous amount of support" in Missouri, including his extended family and church youth group.

The court also heard from K.W., who supported S.W.'s request for guardianship. He testified, "[W]henever I am up here it's basically like she is my mom." When asked why he wanted to stay in Iowa, he replied, "Because I like the school up here and I fit in very well and I want to do my activities up here and I want to stay here with my family that is up here." K.W. also confirmed that he loved his mother and still wanted to visit her.

At the close of the hearing, K.W's attorney and the court visitor both recommended granting S.W.'s guardianship petition. His attorney told the court:

> I believe that he continues to do well in school and behavioral-wise certainly because of the foundation that he received in his mother's care, but at the age where my client is at, this is a crucial time for him to develop and figure out kind of where he needs to be in life. And he's asking that he be able to stay here in Iowa for this

---

[4] The guardian ad litem in that case first recommended K.W. remain with his mother, but after K.W. shared audio with her and informed her that J.A. was emotionally abusive, she changed her opinion.

time to be able to develop that and figure out where he needs to be and what his hopes are.

The court visitor addressed only the short term:

My recommendation in the report was to allow [K.W.] to remain in Iowa under the care of [S.W.] in a guardianship at least for now. I requested a six-month review, and in that time I am hopeful that [K.W.] can do some work in therapy, both individually and with his mom. Perhaps at that time he'll want to go back to Missouri. I think he knows that eventually that's probably where he would end up, but right now he's voiced . . . what he wants.

In its order denying S.W.'s petition, the juvenile court found that J.A. was willing and able to exercise the powers the court would give a guardian, and that it was not in K.W.'s best interests to continue the guardianship. S.W. appeals.[5]

## II. Scope and Standard of Review

We review de novo the juvenile court's decision to deny a petition for guardianship of a minor. *In re Guardianship of P.M.*, No. 21-0146, 2021 WL 4592775, at *1 (Iowa Ct. App. Oct. 6, 2021). "We give weight to the juvenile court's factual findings, but we are not bound by them." *In re Guardianship of L.Y.*, 968 N.W.2d 882, 892 (Iowa 2022).

The burden is on the petitioner to prove the propriety of a guardianship without parental consent by clear and convincing evidence. Iowa Code § 232D.204(2). Evidence reaches the level of "clear and convincing" when the fact finder has no serious or substantial doubts about the conclusions of law derived from the evidence. *L.Y.*, 968 N.W.2d at 898 (applying this "most demanding standard" when considering whether a guardianship should be maintained against a parent's wishes). Our supreme court has also explained that the parental

---

[5] J.A. waived the chance to file an appellee's brief.

preference in guardianship cases is "inseparably intertwined with the fundamental liberty 'interest of parents in the care, custody, and control of their children.'" *Id*. at 896 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).

### III.    Analysis

S.W. contends that the juvenile court erred in finding that J.A. was willing and able to exercise the powers that the court would grant to a guardian.  To assess her contention, we start with the language of the statute:

> The court may appoint a guardian for a minor without the consent of the parent or parents having legal custody of the minor if the court finds by clear and convincing evidence all of the following:
> a. No parent having legal custody of the minor is willing or able to exercise the power the court will grant to the guardian if the court appoints a guardian.
> b. Appointment of a guardian for the minor is in the best interest of the minor.

Iowa Code § 232D.204(2).

The powers that a court may grant to a guardian include (a) taking custody of the minor and establishing the minor's permanent residence; (b) consenting to medical, dental, and other health care treatment and services; (c) arranging for the minor's education; (d) consenting to professional services to ensure the safety and welfare of the minor; (e) applying for and receiving funds and benefits payable for the support of the minor; and (f) any other powers specified by the court.  Iowa Code § 232D.401(3).

S.W. argues that although J.A. is willing to exercise these powers, J.A. has not shown that she is able to do so effectively.  S.W. reiterates her trial testimony that J.A. is not a safe caregiver, considering the sexual abuse perpetrated by K.W.'s stepfather and J.A.'s alleged emotional and physical abuse of her son.

In our de novo review of the record, we find S.W. did not prove by clear and convincing evidence that J.A. cannot effectively parent her son. *See P.M.*, 2021 WL 4592775, at *3 (reviewing effectiveness when analyzing parent's ability to care for the child). J.A. had physical custody of K.W. for most of his life and has a permanent home for him. *See* Iowa Code § 232D.401(3)(a). We recognize that K.W. suffered trauma in that residence at the hands of his stepfather. But when K.W. confided in his mother about B.A.'s abuse, she called the police and obtained a protective order. She read a victim impact statement at B.A.'s sentencing on K.W.'s behalf and enrolled K.W. in therapy. J.A. recognized the importance of addressing her son's mental health following his victimization. *See id*. § 232D.401(3)(d).

J.A. also understands K.W.'s medical needs and ensures he takes his medications. *See id*. § 232D.401(3)(b). K.W. was born prematurely and suffers from asthma and ear troubles. J.A. schedules all his medical appointments, including those with ENTs and other specialists. In fact, she retained that obligation when the custody arrangement was modified. J.A. also arranged for dental work during K.W.'s brief visit to Missouri after he fell at the hospital in Iowa and knocked his tooth loose. On top of arranging for health care, the record shows that J.A. will provide for K.W.'s education in Missouri, as she has done for most of his life. *See id*. § 232D.401(3)(c). She testified that he visited friends and teachers from his former school when he returned from Iowa.

Next, we address the allegations that J.A. often yelled at K.W. and once initiated physical contact causing a bruise. By all accounts, J.A. has not had a perfect relationship with K.W. But S.W. has not shown by clear and convincing

evidence that J.A.'s indiscretions have prevented her from exercising the duties we place on guardians. As for the physical contact, J.A. does not deny it happened but testified she was pushing him away, and K.W. was exaggerating the incident. While K.W.'s allegation is concerning, we lack sufficient evidence to evaluate which version is more credible. In the end, it appears to be an isolated incident that predates his father's death. And we find it significant that the juvenile court declined to adjudicate K.W. as a child in need of assistance. *See id*. § 232D.204(3).

Like the juvenile court, we find J.A. is able and willing to exercise the powers of a guardian outlined in section 232D.401(3). She has a support system to help meet K.W.'s needs. K.W.'s grandmother often assists J.A., and K.W.'s extended family attends his extracurricular activities. K.W. also enjoys a good relationship with his youth pastor at their church. J.A. testified that following L.W.'s death, she wanted K.W. to come home and grieve. By the hearing, J.A. had explored therapy options.

Before closing, we acknowledge K.W.'s preference for staying at his high school in Iowa and his desire to maintain a close connection with S.W. and other members of his father's family.[6] We credit this teenager for clearly expressing his support of the guardianship petition. *Cf. In re A.R.*, 932 N.W.2d 588, 592 (Iowa Ct. App. 2019) (discussing children's preference in a termination-of-parental-rights case). But his preferences are more relevant to a determination of best interests,

---

[6] We also recognize the court visitor recommended a guardianship with S.W. But we find the overall recommendations to be informative and not binding. And we note that the court visitor believed it was imperative that K.W. see J.A. often. *See* Iowa Code § 232D.305.

which we need not address.[7]  When it comes to section 232D.204(2)(a), we are not asked to weigh which household is best.  Instead, the only question is whether a parent is willing and able to exercise the powers that would go to the guardian. J.A. is willing and able.

## IV. Conclusion

Finding that S.W. failed to prove grounds to establish a guardianship under Iowa Code section 232D.204(2)(a) by clear and convincing evidence, we affirm the juvenile court.

**AFFIRMED.**

---

[7] Because S.W. failed to prove that no parent was willing or able to exercise the powers of a guardian, we need not discuss the second element—whether appointment of a guardian was in K.W.'s best interests.  *See* Iowa Code § 232D.204(2) (requiring proof of "all" the following elements).